John **BUTTREY** and John Buttrey Developments, Inc., Plaintiffs-Appellants,

v.

**UNITED STATES** of America, et al., Defendants-Appellees.

No. 81–3234.

United States Court of Appeals, Fifth Circuit.

Nov. 8, 1982.

---

Deutsch, Kerrigan & Stiles, Charles K. Reasonover, Pamela Pryor Mehle, New Orleans, La., for plaintiffs-appellants.

Kay Richman, Anne S. Almy, Appellate Section, U. S. Dept. of Justice, Land & Natural Resources Div., Washington, D. C., for defendants-appellees.

Before CLARK, Chief Judge, POLITZ and RANDALL, Circuit Judges.

RANDALL, Circuit Judge:

This is an appeal from a district court judgment rejecting the claim of plaintiffs-appellants John Buttrey and John Buttrey Developments, Inc. that the United States Army Corps of Engineers had improperly denied Buttrey's application for a dredge and fill permit under section 404 of the Clean Water Act. 33 U.S.C. § 1344 (Supp. IV 1980). We conclude that the procedures afforded Buttrey in the determination of his permit application violated neither his statutory nor his constitutional rights and that the determination itself was neither arbitrary nor capricious. We therefore affirm the decision of the district court.

## I. THE FACTS AND PROCEEDINGS BELOW.

John Buttrey is a land developer who builds residential homes. In November, 1978, he applied to the Mobile, Alabama, district office of the Corps of Engineers for a permit to channelize a half-mile long portion of a small, slow running stream known as Gum Bayou. The bayou passes near Slidell, Louisiana, before flowing into the West Pearl River. Buttrey accompanied his application with a letter from the Louisiana Stream Control Commission, stating that, having examined a drawing submitted by Buttrey, it was "of the opinion that water quality standards of the State of Louisiana will not be violated provided turbidity during dredging in public waters is kept to a practicable minimum." He also included comments from the St. Tammany Parish Mosquito Abatement District No. 2. The District stated that Buttrey's project would help eliminate potential mosquito breeding areas, provided only that adequate drainage was achieved as per the proposal to avoid the possibility of creating any new breeding sites.

The Corps of Engineers issued a formal public notice of the proposed dredge and fill operation on February 2, 1979. This notice was distributed to all known interested persons to assist in developing facts on which a decision could be based. In the ensuing months, the Corps received numerous comments opposing the issuance of the permit:

letters came from the Fish and Wildlife Service of the United States Department of the Interior, the United States Environmental Protection Agency and the National Marine Fisheries Service of the United States Department of Commerce, and from numerous private organizations and individuals. The comments all tended to raise the same objections. The proposed project, they claimed, would destroy natural drainage and sewage treatment capacity, replace a habitat and nursery ground for wildlife with residential homes, perhaps irrevocably damage an aesthetically pleasing wetland area, and, finally, increase the risk of flooding, both downstream and in Buttrey's neighboring Magnolia Forest housing development.

The Corps forwarded copies of all of the comments to Buttrey for review and response. Buttrey requested and received a six-month extension of time for filing his answer. On September 28, 1979, he submitted: (1) a memorandum of law supporting the permit request; (2) an environmental analysis with comments prepared by Dr. Alfred Smalley, Professor of Biology at Tulane University; (3) an engineering discussion with comments prepared by Ivan Borgen, a consulting engineer; (4) a letter supporting the application submitted by the Magnolia Forest Homeowners Association; (5) three other letters, also supporting the application, from downstream property owners; and (6) an aerial photograph of the area. With respect to "any objection which the Corps may feel to be of such a nature as to warrant denial of the permit," Buttrey requested: (1) that he be notified of the specific objection involved, and that he be permitted to provide the Corps a full and detailed response; (2) that he be granted a conference with the Corps in order to resolve any outstanding objections that could not be resolved on the basis of the material furnished; and (3) that, should there exist any objection that might preclude issuance of the permit, he be granted an adversary hearing, and an opportunity to cross-examine witnesses. The responsible official, District Engineer Col. Ryan, responded that Corps regulations precluded the possibility

of a full adversary hearing, but that he would be happy to meet with Buttrey informally. Reserving his right to demand a full hearing, Buttrey accepted the invitation, and met with Col. Ryan on February 8, 1980.

The parties remained unable to resolve their differences. On April 2, 1980, the Corps issued an "Environmental Assessment" and an "Evaluation of the Effects of the Discharge of Dredged or Fill Material Into Waters of the U. S. Using the Section 404(b) Guidelines," and denied Buttrey's permit application. After extensively reviewing the Corps' evaluation process, Col. Ryan made the following "evaluation and findings":

> Based upon review of the application, conducting an environmental assessment, preparation of a 404(b) evaluation, and consideration of all comments by other agencies and the public, and after weighing all known factors involved in the proposed action, I find in concurrence with national policy, statutes and administrative directives, when the total adverse effects of the proposal are weighed against the benefit to the using public, the public interest would best be served by denial of the requested permit.

The Corps noted particularly that "the environmental effects associated with implementation of the proposal are significant and adverse."

One month later, having exhausted the procedures provided by the Corps of Engineers, Buttrey filed with the United States District Court for the Eastern District of Louisiana an action for damages and declaratory and injunctive relief. Buttrey's complaint asserted: (1) that the Corps had no jurisdiction over the project; (2) that even assuming the Corps had jurisdiction, its own regulations exempted the proposed project from regulation under section 404; and (3) that, as applied in this case, the Clean Water Act and the regulations thereunder were unconstitutional. After a hearing on August 21, 1980, and upon consideration of the Corps' motion for a protective order and Buttrey's memorandum in opposition, the

district court authorized the production of certain documents and the taking of depositions from Col. Ryan and Donald Conlon (Chief of the Regulatory Functions Branch). Both Buttrey and the Corps submitted motions for summary judgment and memoranda in support of their motions, and, following a hearing on the cross-motions, both parties submitted post-hearing memoranda "on the issue of whether an adjudicatory hearing is required when . . . the jurisdiction of the Corps . . . is challenged." On April 1, 1981, the district court issued its opinion denying Buttrey's motion for summary judgment and granting summary judgment for the Corps. The district court held:

(1) where the Corps' regulatory jurisdiction over a proposed "dredge and fill" project is challenged, an adjudicatory hearing is not required for the purpose of determining the propriety of the jurisdictional claim;

(2) the Corps has jurisdiction to require permit issuance for the project in question;

(3) the procedures employed by the Corps in the processing of plaintiffs' permit were not unconstitutional;

(4) on the basis of the administrative record, the permit was properly denied; and

(5) plaintiff's claim for damages, allegedly due to either an unconstitutional taking of property without compensation or, alternatively, for the delay plaintiff has incurred as a result of the Corps' permitting process, is denied.

Judgment was entered accordingly, and Buttrey now appeals.

On appeal, Buttrey contends that he was denied his constitutional and statutory rights because the Corps refused to grant him a trial-type hearing, that the administrative record was incomplete, that the procedures employed by the Corps in determining that it had jurisdiction were improper, and that the permit was arbitrarily and capriciously denied.

## II. WHAT KIND OF HEARING?

Buttrey's claim that he was wrongfully denied a full trial-type hearing is both statutory and constitutional. The statutory claim is based on a reading of the Administrative Procedure Act, 5 U.S.C. § 554(a) (1976), together with section 404(a) of what is now called the Clean Water Act, 33 U.S.C. § 1344(a) (Supp. IV 1980). The constitutional claim is based on the due process clause. Because the statutory argument is the more straightforward, we shall address it first.

### A. *The Administrative Procedure Act.*

■ The formal trial-type hearing procedures that Buttrey wants are set out in sections 7 and 8 of the Administrative Procedure Act, 5 U.S.C. §§ 556–557 (1976), and are triggered by language at the beginning of section 5: "This section applies . . . in every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing . . . ." 5 U.S.C. § 554(a) (1976). Since in the present case the Corps has acted under the authority of section 404 of the Clean Water Act, the determinative issue is whether section 404 "require[s]" disputes to be "determined on the record after opportunity for an agency hearing." Buttrey claims that it does, and the government claims that it does not. We agree with the government.

Section 404 seems relatively simple. It says, quite plainly, that the Corps of Engineers "may issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a) (Supp. IV 1980). Buttrey argues that "public hearings" means the trial-type hearing provided for in the APA. There are, however, many different kinds of "hearing," and resolution of the issue must turn on "the substantive nature of the hearing Congress intended to provide." *Seacost Anti-Pollution League v. Costle,* 572 F.2d 872, 876 (1st Cir.), *cert. denied,* 439 U.S. 824, 99 S.Ct. 94, 58 L.Ed.2d 117 (1978) (footnote omitted).

Three other circuits have construed virtually identical language in section 402 of the

Clean Water Act, 33 U.S.C. § 1342(a)(1) (1976) ("after opportunity for public hearing"), to require a trial-type hearing, *Seacoast, supra; Marathon Oil Co. v. Environmental Protection Agency,* 564 F.2d 1253 (9th Cir. 1977); *United States Steel Corp. v. Train,* 556 F.2d 822 (7th Cir. 1977). The question, then, is whether section 402 can be distinguished from section 404, despite the similarity of language and despite the fact that both sections are part of the same statutory scheme.

■ We begin with the observation that none of the three opinions construing section 402 held that the phrase found in both sections—"after opportunity for public hearing[s]"—was so clear that there was no need to look behind it for other indications of congressional intent. *See Costle v. Pacific Legal Foundation,* 445 U.S. 198, 218, 100 S.Ct. 1095, 1107, 63 L.Ed.2d 329 (1980) (commenting that statute's "opportunity for public hearing" requirement is "rather amorphous"). It is, moreover, very possible "for a term to have different meanings, even in the same statute." *Environmental Defense Fund, Inc. v. Costle,* 631 F.2d 922, 927 (D.C.Cir.1980) (footnote omitted), *cert. denied,* 449 U.S. 1112, 101 S.Ct. 923, 66 L.Ed.2d 841 (1981). We therefore look to the legislative history for help in determining what Congress meant when it called for "hearings" in section 404.

This is one of those rare instances when a statute's history leaves no room for doubt. Congress did not intend that the "public hearings" called for in section 404 be trial-type hearings on the record. When confronted with a choice between a House version of section 404, which invested permit authority in the Corps of Engineers, and a Senate version, which invested authority in the EPA, Congress consciously chose the House version. The Corps of Engineers had apparently been using its simplified procedures to issue dredge and fill permits (under a related statute) for many years. *See* Rivers and Harbors Appropriation Act of 1899, § 10, 33 U.S.C. § 403 (1976 & Supp. IV 1980). When Senator Muskie presented the Conference Committee report on the Senate floor, he explained:

The Conferees were uniquely aware of the process by which the dredge and fill permits are presently handled and did not wish to create a burdensome bureaucracy in light of the fact that a system to issue permits already existed.

118 Cong.Rec. 33,699 (1972) (prepared remarks of Sen. Muskie, presented on behalf of the Conference Committee but not delivered orally). Congress *consciously* chose to use the simplified permit procedures that the Corps had developed in administering its existing dredge and fill permit program. Congress did not intend to burden the implementation of section 404 with a trial-type hearing requirement, and we decline to do so today. *See, e.g., Nofelco Realty Corp. v. United States,* 521 F.Supp. 458 (S.D.N.Y. 1981) (also construing section 404 not to require trial-type hearings); *cf. United States v. Independent Bulk Transport, Inc.,* 480 F.Supp. 474, 480 (S.D.N.Y.1979) ("The decision by Congress to confer authority for enforcement of section 1321(b)(6) upon the Coast Guard [rather than the EPA] reflects a desire to dispense with procedural intricacies.").

The subsequent history of the Clean Water Act reinforces our conclusion that section 404 does not require trial-type hearings. Congress amended section 404 and several other provisions of the Act in 1977, but again chose to leave the Corps' existing permit granting system intact. The Senate and House reports on the amendments both impliedly approved the Corps' section 404 regulations. S.Rep.No. 370, 95th Cong., 1st Sess. 80, *reprinted in* [1977] U.S.Code Cong. & Ad.News 4326, 4405; H.R.Conf.Rep.No. 830, 95th Cong., 1st Sess. 105, *reprinted in* [1977] U.S.Code Cong. & Ad.News 4424, 4480. Their only overriding concern about the Corps' section 404 procedures seems to have been for eliminating delay and red tape in processing applications. *See, e.g.,* S.Rep.No. 370, at 80, reprint at 4405 (section entitled "Unnecessary regulation and red-tape"); H.R.Conf.Rep.No. 830, at 104, reprint at 4479 (recommended procedures "[t]o expedite the consideration of permit

applications, and to avoid unnecessary delay"). Indeed, we note that advocates on the "industry" side of the water pollution controversy complain bitterly about the Corps' "complex and unnecessary permit processing procedures." Parish & Morgan, *History, Practice and Emerging Problems of Wetlands Regulation: Reconsidering Section 404 of the Clean Water Act,* 17 Land & Water L.Rev. 43, 78 (1982). In short, requiring trial-type hearings would do violence to the obvious congressional purpose of making section 404 processing procedures as simple as possible.

■ The "public hearings" language in section 404 was, in fact, written into the statute to protect the public, not permit applicants. As Professor Davis has pointed out, "when many are affected, [the term "public hearing"] usually means a speech-making hearing rather than a [trial-type] hearing with a determination on the record." 2 K. Davis, *Administrative Law Treatise* § 12:7, at 434 (2d ed. 1979). This circuit has already decided that the "public hearings" referred to in the Corps of Engineers' dredge and fill permit regulations means the kind of "speech-making" hearing described by Professor Davis: "[I]f sufficient public interest is shown in [a] project, then the District Engineer of the Corps is authorized to conduct a public, informal hearing at which both proponents and opponents of the project are allowed to be heard." *Taylor v. District Engineer,* 567 F.2d 1332, 1338 (5th Cir. 1978) (construing 33 C.F.R. § 209.120(g)(4) (superseded 1977)). *See also Sierra Club v. Alexander,* 484 F.Supp. 455, 470–71 (N.D.N.Y.), *aff'd mem.,* 633 F.2d 206 (2d Cir. 1980) (reason for public hearings by federal agencies is to elicit "input" from the public to assist agency in determining whether a proposed act is in the public interest). The current regula-

tions are essentially the same as those construed in *Taylor, see* 33 C.F.R. § 327.8 (1981),[1] and foreclose our reaching any conclusion different from the one reached in *Taylor:*

> Public hearing means a public proceeding conducted for the purpose of acquiring information or evidence which will be considered in evaluating a proposed Department of the Army permit action, or Federal project, and which affords to the public the opportunity to present their views, opinions, and information on such permit actions or Federal projects.

33 C.F.R. § 327.3(a) (1981). It therefore follows that "public hearing[s]" means exactly what the regulation says it means, and that Buttrey is thus not entitled under section 404 of the Clean Water Act and section 5 of the Administrative Procedure Act to insist on a trial-type oral hearing.

### B. *The Due Process Clause.*

■ Buttrey's argument that he is nonetheless entitled to a trial-type hearing under the due process clause, U.S.Const. amend. 5, presents a much more difficult issue. While the government claims that Buttrey's dispute with the Corps is mostly legal and concerns only "legislative" facts and policy, Buttrey has continued to insist throughout these proceedings that the case turns entirely on precisely those kinds of narrowly defined questions of "adjudicative" fact that entitle an administrative litigant to an oral, trial-type hearing on the record. We agree with the government. Although the precedents holding that a party who directly challenges an agency's material factual determinations may nevertheless be denied a trial-type hearing have generally been written in the most limiting ·

---

1. The only really material difference between the old regulations, 33 C.F.R. § 209.120(g)(4) (1972) (superseded 1977), and the current regulations, 33 C.F.R. § 327.8 (1981), concerns the right of cross-examination. The old regulations provided that each party had the right to make a rebuttal statement, but that "cross-examination is not usually permitted." The current regulations also provide for rebuttal state-

ments, but then add that "[c]ross-examination of witnesses shall not be permitted." Since the difference in actual practice between the old version and the new seems to be virtually non-existent, *see Regulatory Programs of the Corps of Engineers,* 42 Fed.Reg. 37, 122–23 (1977) (negative implication that the hearing procedures were not materially altered), we do not think that the difference affects our analysis.

language possible,[2] we find that under the facts of this case, and under the Corps' regulations as applied here, Buttrey's "paper hearing" gave him all the process which was due him.

The starting point for any inquiry into how much "process" is "due" must be the Supreme Court's opinion in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).[3] Implicitly adopting the three-part analysis developed by Judge Friendly the previous year, Friendly, "*Some Kind of Hearing*," 123 U.Pa.L.Rev. 1267, 1278 (1975), the Court set out the three most important considerations that a court should balance:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. at 335, 96 S.Ct. at 903 (citation omitted). The first and third considerations pose the fewest problems.

Buttrey clearly has a strong "private interest" in turning what is now commercially worthless swampland into residential homes, which he could then sell. It is equally clear that he is also not a person "on the very margin of subsistence" and that denial of his application will not deprive him of "the very means by which to live." 424 U.S. at 340, 96 S.Ct. at 905. The government, moreover, is doing nothing more than denying him a permit; it is not taking action against him. The distinction is important, for, as Judge Friendly has remarked, "[r]evocation of a license is far more serious than denial of an application for one; in the former instance capital has been expended, investor expectations have been aroused, and people have been employed." Friendly, *supra,* at 1296. The government, in other words, has not taken anything of Buttrey's and made it worth less; rather, it has merely told Buttrey that (at least under his current proposal) he must keep what he has without attempting to make it worth more. This distinction, we hasten to add, is not a disguised attempt

**2.** *See, e.g., Califano v. Yamasaki*, 442 U.S. 682, 696, 99 S.Ct. 2545, 2555, 61 L.Ed.2d 176 (1979) (oral hearing not required in case involving "relatively straightforward matters of computation for which written review is ordinarily an adequate means to correct prior mistakes"); *Dixon v. Love*, 431 U.S. 105, 97 S.Ct. 1723, 52 L.Ed.2d 172 (1977) (three-suspensions-and-you-lose-your-driver's-license rule held to be so narrow that oral hearing not required); *Weinberger v. Hynson, Westcott & Dunning, Inc.,* 412 U.S. 609, 621, 93 S.Ct. 2469, 2479, 37 L.Ed.2d 207 (1973) ("We cannot impute to Congress the design of requiring, nor does due process demand, a hearing when it appears conclusively from the applicant's 'pleadings' that the application cannot succeed."); *Central Freight Lines, Inc. v. United States,* 669 F.2d 1063, 1068 (5th Cir. 1982) (commenting that "[c]ross-examination is . . . not an absolute right in administrative cases" partly because 127 of some 1600 witnesses already had been cross-examined); *ECEE, Inc. v. Federal Energy Regulatory Commission,* 645 F.2d 339, 352 (5th Cir. 1981) ("informal conference and written comment" provision enough to protect private interests in certain well-determination controversies); *Superior Trucking Co. v. United States,* 614 F.2d 481 (5th Cir. 1980) ("paper hearing" is enough

to protect party protesting interlocutory injunction in ICC licensing case). The following is typical of the kinds of caveats that appear in all the cases: "In short, all we hold today is that in *this* case, on *these* facts, *this* plaintiff was not denied due process of law by the City's procedure *as here applied.*" *Basciano v. Herkimer,* 605 F.2d 605, 612 n.8 (2d Cir. 1978) (trial-type hearing not required only on facts of case sub judice) (emphasis in original), *cert. denied,* 442 U.S. 929, 99 S.Ct. 2858, 61 L.Ed.2d 296 (1979).

**3.** We note parenthetically that although there is a Fifth Circuit opinion almost directly on point, *Taylor v. District Engineer,* 567 F.2d 1332, 1338 (5th Cir. 1978) (upholding the Corps' permit granting procedures against a due process challenge), we choose not to rely on it as the exclusive support for our decision. The opinion in *Taylor* briefly noted that the Corps' regulations, as applied in that case, were constitutional, but did not refer to *Eldridge* or any of the other due process cases. While we fully agree with the end result in *Taylor,* we think that the most prudent course—in this area where so much depends upon the facts of each case—is to undertake a full analysis of the question ourselves.

to revive the discredited doctrine of "rights" and "privileges." We draw the distinction merely in an attempt to determine, in the words of the *Eldridge* opinion, what weight we should give to "the private interest that will be affected by the official action." 424 U.S. at 335, 96 S.Ct. at 903. And like the *Eldridge* court—which decided that the disabled worker was entitled to less process than the welfare recipient—we decide that Buttrey's interest, while important, is not great enough to demand the imposition of full trial-type procedures without further careful analysis.

The third *Eldridge* consideration, also fairly uncomplicated, demands that we examine the "fiscal and administrative burdens" that trial-type proceedings would entail. 424 U.S. at 335, 96 S.Ct. at 903. We understand that a routine imposition of trial-type procedures on the Corps would entail a substantial, and probably unbearable burden. Col. Ryan has testified that the Mobile District alone processes some 1200 applications per year, Ryan Deposition at 18, and the government has informed us that the Corps presently has *no* administrative law judges assigned to it. Brief for Appellee at 21 n.13. Trial-type hearings, if routinely or even often granted, would not simply impose a "burden" on the Corps. Such a requirement in all likelihood would make it impossible for the Corps to carry out its Congressional mandate under section 404 at all. The Corps' situation is not atypical. In connection with a related water pollution control program, for instance, the Supreme Court has emphasized that if the EPA were required to grant oral hearings in "most" of its 2200 yearly applications, there would be "serious questions about the EPA's ability to administer the . . . program." *Costle v. Pacific Legal Foundation*, 445 U.S. 198, 215, 100 S.Ct. 1095, 1105, 63 L.Ed.2d 329 (1980). These facts lead us to conclude that absent fairly unusual circumstances, and under the present regulations as applied in this case, the Corps should not be required routinely to grant requests for trial-type hearings.

Finally, the second and most complicated *Eldridge* consideration requires us to balance "the risk of an erroneous deprivation of [the administrative litigant's] interest through the procedures used" against the "probable value, if any, of additional or substitute procedural safeguards." 424 U.S. at 335, 96 S.Ct. at 903.

■ We preface what follows with a word of warning. Any inquiry under the second *Eldridge* heading must necessarily be very fact-specific. A procedure that seems perfectly reasonable under one set of circumstances can, with only a slight modification of the facts, suddenly "smack . . . of administrative tyranny." *Larry v. Lawler*, 605 F.2d 954, 962 (7th Cir. 1978). This area of the law therefore ill-lends itself to sweeping generalizations, and all the less so because of the variegated contexts in which the problems arise: high-stakes administrative cases such as the present one, where each side is skillfully represented by experienced counsel and where no expense is spared, little resemble the context in which many of the leading cases have arisen. Many of the leading decisions are social security, welfare, or similar cases, where the plaintiffs may not be represented by counsel and may not fully understand their rights. The only truly general principle that appears in all the decisions seems to be that the more articulate an administrative plaintiff is likely to be, the more chances he has effectively to rebut the agency's case against him, and the more his "factual" objections shade over into the area of legislative fact and policy, the less likely it is that he will be entitled—depending upon the entire three-part *Eldridge* test—to a full trial-type hearing, held on the record with a right to cross-examine witnesses. Each case, in other words, will depend upon the nature of the facts challenged and upon the effectiveness of the procedures afforded the plaintiff for challenging them.[4]

---

4. In a case such as the present one, where the plaintiff has already been afforded an extensive "paper hearing," the threshold issue is whether

he can "understand the case against him and . . . present his arguments effectively in written form." *Friendly, supra,* at 1281. *Cf. Goldberg*

The procedures adopted by the Corps of Engineers in reviewing Buttrey's section 404 permit application afforded him considerable protection. The Corps in effect gives applicants a "paper hearing." After public notice of the pending application has been given, the Corps usually receives numerous comments from other federal agencies and the interested public. As the comments arrive, they are (and were in this case) immediately forwarded to the applicant. The pertinent regulation provides:

> The applicant must be given the opportunity to furnish the District Engineer his proposed resolution or rebuttal to all objections from Government agencies and other substantive adverse comments before final decision will be made on the application.

33 C.F.R. § 325.2(a)(3) (1981). Understandably eager to write the most effective rebuttal possible, Buttrey asked for and got six months within which to prepare his response. It ultimately included a ten-page memorandum of law, a nine-page technical analysis by a biology professor at Tulane University, and an elaborate engineering analysis commissioned from a consulting engineer. Buttrey also demanded and got a chance to meet informally with the District Engineer, Col. Ryan. At the end of all this, the Corps nevertheless decided to deny the application. Col. Ryan filed three detailed documents supporting and explaining his decision: a four-page "Environmental Assessment," see 33 C.F.R. § 325.2(a)(4), a three-page evaluation of the project under the Corps' section 404(b) or "wetlands" guidelines, see 33 C.F.R. § 325.2(a)(6); 40 C.F.R. § 230, and an eight-page document entitled "Findings of Fact," reviewing all of the documents and information used in reaching the decision, see 33 C.F.R. § 325.-2(a)(6). These three documents were then mailed to Buttrey pursuant to 33 C.F.R. § 325.2(a)(7).

All of this is, we think, a great deal of "process." The question only remains whether the imposition of trial-type procedures could reduce the risk of error enough to make the reform worth the cost.

The particular facts of this wetlands controversy now become critically important. Buttrey complains generally, first, that "there is no scientific basis for the conclusions" reached in Col. Ryan's findings of fact, Appellant's Initial Brief at 9, and second, that his proposed project would *not* have "adverse environmental impact," Appellant's Reply Brief at 3. He also makes two more specific factual arguments. He claims, first, that his project will *not* lessen downstream water quality, Initial Brief at 14, and second, that his project is necessary to prevent flooding in his adjacent Magnolia Forest subdivision, Initial Brief at 16, 30. Buttrey freely concedes that he is claiming, in effect, that "[i]f the Corps' facts were true, [I] would have no case." Reply Brief at 3. For Buttrey, this case is all about these few specific questions of "adjudicative" fact. *See* Reply Brief at 9–10 (conceding that the facts listed in this paragraph are the only essential ones in dispute). For Buttrey, in short, this case involves no policy questions, no broader questions of "legislative" fact. *See id.*

We think that Buttrey has fundamentally misconceived the purpose of section 404 of the Clean Water Act, and further, that he does not understand the nature of the Corps' administrative process.[5]

---

*v. Kelly,* 397 U.S. 254, 269, 90 S.Ct. 1011, 1021, 25 L.Ed.2d 287 (1970) ("Written submissions are an unrealistic option for most [welfare] recipients, who lack the educational attainment necessary to write effectively and who cannot obtain professional assistance."); *Gray Panthers v. Schweiker,* 652 F.2d 146, 156 (D.C.Cir. 1981) (same). Since, as we have intimated above, Buttrey has been skillfully represented by experienced counsel throughout these proceedings, we need not concern ourselves with the kinds of questions that troubled the courts in *Goldberg* and *Gray Panthers.*

**5.** Buttrey contends, for instance, that the Corps' denial of his permit application is invalid partly because it remains "totally unsupported by any admissible evidence." We reject this argument for the reasons given in W. Gellhorn, C. Byse & P. Strauss, *Administrative Law* 730–51 (7th ed. 1979) (collecting and analyzing cases). The leading Supreme Court decision is *Richardson v. Perales,* 402 U.S. 389, 91 S.Ct.

Section 404 of the Clean Water Act was enacted "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a) (1976) (section entitled "Congressional declaration of goals and policy"). Certain value judgments have already been made. The regulations promulgated pursuant to the Act—whose substantive (rather than procedural) validity Buttrey does not challenge—expressly prohibit exactly the kind of factual maneuvering Buttrey is attempting to engage in.

■ Before issuing any dredge or fill permit, the Corps is required to conduct a "public interest" review. This review considers virtually all aspects of a project: "conservation, economics, aesthetics, general environmental concerns, historic values, fish and wildlife values, flood damage prevention, land use, navigation, recreation, water supply, water quality, energy needs, safety, food production, and, in general, the needs and welfare of the people." 33 C.F.R. § 320.4(a)(1) (1981). The regulations further provide that the review may not be "piecemeal"—a few acres here, a small tract there. The rationale is simple. "Although a particular alteration of wetlands may constitute a minor change," the regulations note, "the cumulative effect of numerous such piecemeal changes often results in a major impairment of the wetland resources." 33 C.F.R. § 320.4(b)(3). Specifically, "[w]hen disruptions in flow and circulation patterns occur, apparently minor loss of wetland acreage may result in major losses through secondary impacts." 40 C.F.R. § 230.41(b) (1981). The regulations further state that the Corps shall begin its analysis of a proposed project with the presumption that the "unnecessary alteration or destruction of [wetlands] should be discouraged as contrary to the public interest." 33 C.F.R. § 320.4(b)(1). This presumption is *very* strong. *See* 40 C.F.R. § 230.1(d) ("The guiding principle should be that degradation or destruction of special sites ["such as filling operations in wetlands"]

may represent an irreversible loss of valuable aquatic resources"). To overcome it, an applicant must make three very difficult showings: first, that "the benefits of the proposed alteration outweigh the damage[s]," second, that "the proposed activity is primarily dependent on being located in, or in close proximity to the aquatic environment," and third, that the proposed project cannot be located on any "feasible alternative sites." 33 C.F.R. § 320.4(b)(4). In light of all of the above, it would hardly be putting the case too strongly to say that the Clean Water Act and the applicable regulations do not contemplate that wetlands will be destroyed simply because it is more convenient than not to do so. *See* 40 C.F.R. § 230.1(c). Congress and the agency have already determined that "[w]etlands are vital areas that constitute a productive and valuable public resource," 33 C.F.R. § 320.-4(b)(1); *see* 33 U.S.C. § 1251 (1976), and Buttrey may not challenge that determination here.

■ Buttrey has nevertheless attempted to challenge these policies indirectly by presenting his objections in the guise of arguments about "adjudicative" facts. He argues, for instance, that the Corps should have considered the public benefits of the $3 million or so in public jobs that the construction of his proposed housing addition would create. Appellant's Initial Brief at 13. But this is not the kind of "economic" benefit the Corps' public interest review is supposed to consider. *See Regulatory Programs of the Corps of Engineers,* 42 Fed.Reg. 37, 122, 37, 122, 37, 125–26 (1977) (reviewing history and purpose of the "public interest" review process). Again, Buttrey claims that his project will not harm the environment because the 40 acres at stake in this lawsuit are a "mere flyspeck" in relation to the entire Pearl River watershed. *See* Appellant's "Memorandum of Law in Support of Section 404 Permit Request" at 10, Administrative Record at tab 29. Stripped of its "adjudicative" fact disguise, this "factual" objection amounts to a

1420, 28 L.Ed.2d 842 (1971) (hearsay evidence may constitute "substantial evidence" for pur-

poses of reviewing agency action). Buttrey cites no cases holding to the contrary.

demand that the Corps engage in precisely the kind of limited review of "piecemeal changes" that the regulations forbid. 33 C.F.R. § 320.4(b)(3) (quoted in the preceding paragraph).

Buttrey's related contention that his project would not lessen downstream water quality is also, in effect, no more than an assertion that the policies set out in the Corps' wetlands regulations are fundamentally unsound. His argument manifestly does not concern "adjudicative" facts.

Part of the confusion about the water quality issue stems from the fact that the parties have confused two related questions—suspended silt pollution from the dredging operations themselves and the long term effects from the loss of the purifying natural filtration function of wetlands. Buttrey insists that water quality is an issue, but the only evidence he has presented is a letter, dated February 19, 1979, from the Louisiana Stream Control Commission stating that "water quality standards of the State of Louisiana will not be violated provided turbidity during dredging in public waters is kept to a practicable minimum." This is a complicated way of saying that the Stream Commission is worried that dredging may muddy the waters, but that the problem is not severe enough to warrant cancelling the project. A glance at the statutory authority pursuant to which the letter was written reinforces this impression. The letter refers to a Louisiana statute, 1975 La.Acts 712 (codified at 56 La.Rev.Stat.Ann. § 1439(5)) (repealed 1980), and to sections 303 and 401 of the Clean Water Act, 33 U.S.C. §§ 1313, 1341 (1976 & Supp. IV 1980).[6] But all of these statutes concern only water pollution[7]—an

issue that has nothing at all to do with the unique role that wetlands play in purifying water. See 33 C.F.R. § 320.4(b)(2)(vii) (1981) ("Wetlands through natural water filtration processes serve to purify water."); 40 C.F.R. § 230.41(b) (same). The Corps, on the other hand, has found that Buttrey's project would have "an adverse impact on . . . a wetland having significant functions of water quality maintenance." Attachment 2 at 2, Findings of Fact, Administrative Record at tab 48. Beyond his general assertion that his forty-acre wetland is too small to matter to anyone, Buttrey has not challenged this determination. The material facts about downstream water quality therefore remain undisputed.

Buttrey complains that these findings nevertheless lack a "scientific basis." We think that once one accepts the value judgments already made in section 404 and in the regulations thereunder, the "scientific" basis of the Corps' findings in this case becomes clear.

Buttrey's last factual contention poses a more difficult problem. While he insists that the proposed project will help prevent flooding in the adjacent Magnolia Forest subdivision, several of the public commentators have declared with equal vigor that the bayou does not present a flooding problem even in its present "unimproved" state. Although the regulations do require the Corps to consider "flood damage prevention" in making its public interest review, 33 C.F.R § 320.4(a)(1) (1981), the Corps concluded only that "[d]ata submitted [are] insufficient to determine what impact the project will have on potential downstream flooding." Attachment 1, at 2, Findings of Fact, Administrative Record at tab 48. Indeed,

---

**6.** The letter also mentions section 404 of the Clean Water Act, which was not then applicable to Louisiana. The 1977 additions to section 404 do provide for coordination with approved state regulatory schemes, but Louisiana did not establish such a plan until 1980, see 30 La.Rev. Stat.Ann. §§ 1091·1096 (West Supp. 1982) (state regulation of "dredge and fill" operations to begin Jan. 1, 1980).

**7.** Although the Louisiana statute cited in the text, 1975 La.Acts 712 (repealed 1980), refers to five federal statutes, all five concern only

"water pollution" in the traditional sense, not the kind of water-quality lessening that occurs after the completion of dredge and fill operations in wetlands; moreover, the letter itself makes clear that it is concerned only with the "water quality standards of Louisiana provided for under Section 303" of the Clean Water Act. Section 303, 33 U.S.C. § 1313 (1976), in turn, also only concerns itself with "effluents" and other forms of water pollution in the traditional sense.

while the two-inch thick administrative record in this case contains no probative evidence about the flooding controversy,[8] the regulations suggest that destroying wetlands may *increase* the chances of local flooding. *See* 40 C.F.R. § 230.41(b) (1981). If Buttrey wanted the Corps to appreciate the full danger that the bayou posed to his Magnolia Forest subdivision, he should have presented evidence on the issue. Having chosen not to do so, he cannot now fairly complain that he was denied procedural due process because the data were insufficient.

Against this factual background we must now assess "the probable value ... of additional or substitute procedural safeguards." 424 U.S. at 335, 96 S.Ct. at 903. We conclude that additional procedural safeguards, including the imposition of trial-type procedures, would do virtually nothing to reduce the chances of error.

The regulations themselves—and again we stress that Buttrey has not even mentioned their *substantive* provisions—in effect foreclose the kinds of "factual" arguments Buttrey has made throughout these proceedings. *See generally* Ames & McCracken, *Framing Regulatory Standards to Avoid Formal Adjudication: The FDA as a Case Study,* 64 Calif.L.Rev. 14 (1976) (recommending that agencies draft fact-specific regulations to eliminate as many full adjudications as possible). Congress and the Corps have wisely decided that each litigant should not be able to insist upon a de novo determination of the value of wetlands to the American public. The rationale, as expressed by Professor Davis, seems to be that "evidentiary hearings are usually appropriate only for resolving disputes about facts pertaining to a particular party and are usually inappropriate for resolving other kinds of questions, such as questions of law, policy, discretion, or broad and general facts that help decide questions of law or policy." 2 K. Davis, *supra,* § 13:6, at 237

(Supp.1982). In any event, we think that disputes over "the 'legislative' facts and the proper formulation of policy or interpretation of law to be applied to the case" are best resolved through simple submission of carefully considered written arguments. *See* Gellhorn & Robinson, *Summary Judgment in Administrative Adjudication,* 84 Harv.L.Rev. 612, 630–31 (1971) (footnote omitted).

Even if this case did depend upon conflicting scientific testimony, as Buttrey claims it does, the right of cross-examination provided by full trial-type procedures would probably serve little purpose. Many courts and commentators have concluded that cross-examination of scientific witnesses in a case of this sort is often, if not always, an exercise in futility. *See, e.g., Eldridge, supra,* 424 U.S. at 343–44, 96 S.Ct. at 907 (noting probable worthlessness of opportunity to cross-examine expert physician specialists); *Basciano v. Herkimer,* 605 F.2d 605, 610–11 (2d Cir. 1978) ("[T]he value of cross-examination to discredit a professional medical opinion at best is limited."), *cert. denied,* 442 U.S. 929, 99 S.Ct. 2858, 61 L.Ed.2d 296 (1979); 3 K. Davis, *supra,* § 15:10, at 184 (2d ed. 1980) (recommending that cross-examination be "rarely allowed" in cases involving mixtures of legislative fact and judgment); Ames & McCracken, *supra,* at 35 ("Cross-examination ... will be most cumbersome when the issues are complex ...."); Friendly, *supra,* at 1285 ("in many such ["recondite scientific or economic"] cases the main effect of cross-examination is delay."); Korn, *Law, Fact and Science in the Courts,* 66 Colum.L.Rev. 1080, 1086–87 (1966) (the value of cross-examination "is often negligible where the dispute turns on matters of expert judgment rather than veracity"); *but cf.* Boyer, *Alternatives to Administrative Trial-type Hearings for Resolving Complex Scientific, Economic, and Social Issues,* 71 Mich.L.Rev.

---

**8.** The record does contain a report from Buttrey's consulting engineer, Ivan Borgen, recommending that the bayou be dredged "to minimize flooding within portions" of the Magnolia Forest subdivision, but the report simply states its conclusion without explanation. Nothing in the record indicates when the bayou has flooded in the past, how bad the flooding was, what kind of damage was done, or if it seems likely that similar damage is to be expected if Buttrey's project is not allowed to proceed.

111, 127–28 (1972) (noting controversial nature of cross-examination of expert witnesses).

Buttrey has, moreover, apparently decided not even to attempt to make the three showings required under 33 C.F.R. § 320.-4(b)(4) (1981).[9] Procedural improvements in the nature of trial-type safeguards could do nothing to remedy so fundamental a flaw in the prima facie case. *See Weinberger v. Hynson, Westcott & Dunning, Inc.,* 412 U.S. 609, 620, 93 S.Ct. 2469, 2478, 37 L.Ed.2d 207 (1973) (agency not required to "provide a formal hearing where it is apparent at the threshold that the applicant has not tendered *any* evidence which *on its face* meets the statutory standards as particularized by the regulations").

Finally, Buttrey has been given an oral hearing with Col. Ryan, the District Engineer ultimately responsible for deciding not to issue the section 404 permit. Although Buttrey has intimated that because this meeting was informal and off-the-record it somehow does not "count" in the due process analysis, the courts have unanimously concluded that this kind of informal meeting can often be very important in ensuring that due process is given. The Supreme Court in *Memphis Light, Gas & Water Division v. Craft,* 436 U.S. 1, 18, 98 S.Ct. 1554, 1565, 56 L.Ed.2d 30 (1978), for example, has said that "[t]he opportunity for a meeting with a responsible employee empowered to resolve the dispute" could in some instances be enough of a hearing even without written submissions. *See Goss v. Lopez,* 419 U.S. 565, 583, 95 S.Ct. 729, 740, 42 L.Ed.2d 725 (1975) (providing for informal meetings in school discipline cases); *Goldberg v. Kelly,* 397 U.S. 254, 269, 90 S.Ct. 1011, 1021, 25 L.Ed.2d 287 (1970) ("Informal procedures will suffice."); *Gray Panthers v. Schweiker,* 652 F.2d 146, 166, 169 (D.C.Cir.1981) ("opportunity for informal oral consultations" is enough). The present case is clearly not one where the agency is attempting to hide behind a faceless, bureaucratic mask to avoid having anyone take direct responsibility for an unpopular decision. The Corps

has fully and directly justified its action. *See* 2 K. Davis, *supra,* § 12:12, at 458–59 (2d ed. 1979) (noting the importance of face-to-face meetings with the agency in maintaining public trust and confidence in accuracy of agency's administrative system). We do not, however, hold that the due process clause requires this kind of informal oral hearing in every case. We merely note that in *this* case, Buttrey has been afforded virtually every "process" short of a full trial-type hearing.

We hold, in sum, that Buttrey's property interest, while important, is not overwhelmingly so; that the Corps' paper hearing procedures, with an informal face-to-face meeting, provided Buttrey with a great deal of procedural due process; that imposing a requirement of trial-type procedures, with oral cross-examination of witnesses, would probably not reduce the chance of error; that trial-type proceedings would in any event be prohibitively expensive and so cumbersome as to make it virtually impossible for the Corps to carry out its statutory mandate; and finally, that, after weighing all of these considerations in the balance, Buttrey was given all the procedural protections to which he was entitled under the due process clause of the Constitution. Under the facts of this case, any greater procedural requirements would simply not be worth the cost.

## III. THE DENIAL OF THE PERMIT.

In addition to challenging the procedures used by the Corps to process the permit application, Buttrey challenges the determination itself. He contends that it was arbitrary, capricious, and not in accordance with law in that it was not based on a consideration of all of the relevant facts. *See* Administrative Procedure Act § 10(e), 5 U.S.C. § 706 (1976). Under this standard of review, we must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401

9. *See* text 690 F.2d 1180 *supra.*

U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). We also bear in mind, as the Supreme Court has emphasized, that "[a]lthough this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. [A] court is not empowered to substitute its judgment for that of the agency." *Id.*

Buttrey contends that the Corps in fact ignored the following information: (1) evidence that water quality standards of the State of Louisiana would not be violated; (2) evidence that the proposed project would enhance the aesthetics of the area and improve recreational opportunities; (3) evidence that the project would reduce the chances of flooding and that it had been endorsed by the State of Louisiana as an approved drainage project; (4) evidence that by eliminating mosquito breeding areas, the proposed project would decrease health problems in the area; and (5) evidence that the project would provide economic benefits to the area of approximately $3 million during construction and would place the property on the tax rolls. Appellant's Initial Brief at 14–17. For all of these contentions, Buttrey relies primarily on the deposition testimony of Col. Ryan and Donald Conlon (the Chief of the Regulatory Functions Branch), the taking of which the district court had authorized for purposes of determining the Corps' jurisdiction.

■ Although the depositions were taken only for that limited purpose, Buttrey maintains that some of the responses prove that the Corps acted arbitrarily and capriciously in making its decision. The propriety of thus going outside the administrative record has been discussed in *Camp v. Pitts,* 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). There, the Supreme Court stated that the courts were forbidden from undertaking a de novo inquiry on appeal from an agency decision that had already produced a reviewable record. 411 U.S. at 143, 93 S.Ct. at 1244. The Court added:

> The validity of the [agency's] action must, therefore, stand or fall on the propriety of that finding, judged, of course, by the appropriate standard of review. If that finding is not sustainable on the administrative record made, then the [agency's] decision must be vacated and the matter remanded to [it] for further consideration.

*Id.* As in *Pitts,* the decision here was accompanied by a contemporaneous explanation. We therefore look only to the administrative record in order to determine if the Corps' decision was arbitrary, capricious, or not in accordance with law.

The Environmental Assessment accompanying the Corps' findings of fact made the following points:

> *a. Biological.* This proposed action will result in the permanent destruction of approximately 40 acres of tupelo gum swamp resulting in loss of wetland functions considered valuable to the public interest. There will be an increase in turbidity of the water at and downstream of the proposed site during the construction activity.

> The cumulative effects of this proposed activity will seriously impact the remainder of Gum Bayou and possibly the West Pearl River.

> Data submitted [are] insufficient to determine what impact the project will have on potential downstream flooding.

> *b. Socioeconomic.* The impact should be minimal, however social and/or economic changes could occur over a long period of time.

> *c. Aesthetics.* The proposed activity will destroy the natural features of the existing tupelo gum swamp.

> *d. Land Use.* The proposed activity would change the land use of the existing gum swamp. However, the development of residential lots would be consistent with the land use of the adjacent subdivision.

> *e. Air Pollution.* As a result of the proposed activity changes in air quality could occur due to increased usage of the area.

> *f. Noise.* Noise levels would increase in the area during the construction process. Average noise levels would increase

gradually in the area following the completion of the proposed activity due to an increase in residences and an increase in traffic.

The assessment also asserted that "[a]pproximately 40 acres of substrate [would] be removed or filled, destroying the organisms inhabiting and frequenting this area." The "Evaluation of the Effects of the Discharge of Dredged or Fill Material into Waters of the U. S. Using the Section 404(b) Guidelines," which also accompanied the Corps' findings of fact, then enumerated the costs and benefits that the Corps weighed before determining that the permit application should be denied.

The Corps' decision must, in the words of the Supreme Court, "stand or fall," 411 U.S. at 143, 93 S.Ct. at 1244, on the issue of whether it acted arbitrarily and capriciously in finding that when the total adverse effects of the proposal are weighed against the benefit to the public, the public interest would best be served by denial of the requested permit. A careful review of the record does not indicate that the Corps failed to consider all the facts. Comments favorable to the proposal were included in the record and were individually acknowledged by the Corps in its findings. Nonetheless, the Corps, after considering all the facts, found that the costs of the project outweighed its potential benefits and that the public interest would best be served by denying the permit. We do not consider this conclusion arbitrary, capricious or not in accordance with law.[10]

## IV. THE CORPS' WETLANDS DETERMINATION.

Buttrey also challenges how the Corps determined that "wetlands" were involved and the failure of the district court

to engage in its own substantial inquiry. The Corps found that Buttrey's proposal would destroy wetlands and therefore lessen the water quality associated with a freshwater swamp and stream. Although Buttrey concedes that his bayou is a wetland, he insists that the Corps never determined the extent of the wetlands involved or what, if any, impact the proposed project would have on "wetlands." The Corps' Environmental Assessment, however, states that the proposed action would result in the destruction of approximately 40 acres of tupelo gum swamp resulting in loss of wetland functions considered valuable to the public interest. The essence of Buttrey's complaint is that the Corps itself conducted no tests in determining wetlands jurisdiction and instead relied on information supplied by other individuals and agencies. Buttrey has failed to show, however, that anything more was required. He does not deny that the Corps' finding of wetland status is correct. Reports from the Fish & Wildlife Service, the Environmental Protection Agency and the National Marine Fisheries Service all described the area as a wetland. There is, therefore, sufficient basis for us to uphold the Corps' "wetlands" finding under the "arbitrary and capricious" standard of review.

Buttrey also urges that, because the determination of wetlands status goes to the Corps' jurisdiction, the district court erred in refusing to engage in its own substantial inquiry into the extent of the wetlands and the environmental impact of the project. Again we disagree. Buttrey does not argue that the Corps' regulations improperly define wetlands. To determine, then, that the Corps had acted within the scope of its authority, the district court

---

10. In addition to contending that the Corps failed to consider all relevant factors, Buttrey contends that the district court failed in its duty to review the agency action to ascertain that the relevant factors had been considered. We find no support for this assertion. The district court expressly concluded that the public interest was neither ignored nor dishonored, despite the fact that Buttrey made much of the Corps' failure to articulate meaningfully those

public interests which, by statute and regulation, it must consider in the permit process. The district court accompanied this conclusion with a quotation from *Ethyl Corp. v. EPA,* 541 F.2d 1 (D.C.Cir.), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976), to the effect that the court must determine whether the agency decision was rational and based on consideration of the relevant factors.

needed only to find that the Corps "could have reasonably believed" that the factual predicate necessary to its assertion of authority existed. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). At that point, the factual findings that form the basis of the Corps' decision become reviewable, as indicated above, under the "arbitrary and capricious" standard of review. We conclude that the Corps' decision is neither arbitrary nor capricious.

AFFIRMED.