**CONTINENTAL AIR LINES, INC., Petitioner,**

v.

**Elizabeth Hanford DOLE, Secretary of Transportation, Respondent.**

No. 84–4840.

United States Court of Appeals, Fifth Circuit.

March 14, 1986.

Richard Bennet Hirst, Houston, Tex., for petitioner.

Thomas L. Ray, Office of Gen. Counsel, U.S. Dept. of Transp., Washington, D.C., for respondent.

Before GARWOOD, HIGGINBOTHAM and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Continental appeals, as too low, an award of the Civil Aeronautics Board (CAB), for providing compulsory standby air service from Honolulu, Hawaii, to Pago Pago, American Samoa between January 31, 1982, and May 13, 1982. Continental argues that the method of arriving at the award denied it procedural due process, that the order was not supported by substantial evidence and that the denial of compensation for certain time periods is contrary to the Federal Aviation Act and the Fifth Amendment of the United States Constitution. We find no error and affirm.

## I. BACKGROUND

The Federal Aviation Act allows a carrier providing essential air service to a community to terminate that service after giving ninety days advance notice. 49 U.S.C. § 1389(a)(3). If no other carrier can re-

place that service, the CAB may require the original carrier to maintain service after the notice period ends and until a replacement carrier is found. 49 U.S.C. § 1389(a)(6). When the carrier is required to maintain service beyond the ninety-day notice period, the Board must compensate the carrier for losses incurred in following the Board's order. 49 U.S.C. § 1389(a)(7)(B).

Continental provided air service between Pago Pago and Honolulu from 1977 until December 1981. On December 28, 1981, Continental notified the CAB that it intended to terminate its service along the Pago Pago route in ninety days. Ordinarily, an air carrier must continue essential service until the expiration of the ninety-day notice period but because another carrier agreed to serve Pago Pago beginning January 31, 1982, the CAB allowed Continental to end its service on that date. Because the Board was concerned with the reliability of the replacement carrier, the CAB required Continental to remain ready on twenty-four hours notice to resume Pago Pago service should the replacement carrier's service falter. Continental provided this backup service until May 13, 1982, when the CAB permitted it to withdraw from this reserve role.

Continental petitioned the Board for compensation from February 1, 1982, the date it began its backup service until its backup service terminated on May 13, 1982. Continental claims that maintenance of its state of readiness to backup the Pago Pago service cost $1,941,595. To support this figure, Continental filed numerous exhibits and affidavits with the Board. The Board, based on the evidence submitted by Continental and an audit conducted by the Board's staff, awarded Continental $21,394. Continental submitted additional evidence and petitioned for an increase in what it considered a grossly ·inadequate award. The Board considered Continental's petition and supporting documentary evidence and tentatively increased the award to $39,208 and issued an order to show cause why that award should not become final. Continental again complained that the award

was too low and submitted more evidence to support its position. Continental also requested an informal conference with the Board and a formal hearing to assist the Board in resolving the dispute. The Board denied Continental's request for a hearing but after two informal conferences in which Continental's representatives met with the Board's staff, the Board increased the award to $237,390. Continental's appeal brings the dispute over the amount of the award to this court.

## II. PROCEDURAL DUE PROCESS

Continental asserts that the facts found by the Board in this case fit neatly within the model for adjudicative facts which answer the questions of who did what, where, when, how, why, and with what motive or intent. Continental contends that when an adjudicative, as opposed to a legislative fact finding function is performed, an administrative agency must provide a trial-type hearing on the record. The Board, on the other hand, argues that the award of compensation to Continental was a policy decision involving cost allocation closely tied to rate-making and that such determinations are legislative in nature. The Board argues that in cases such as this involving largely policy decisions, formal trial-type hearings are not as important. The Board also contends that in cases of this type greater deference should be given to the agency's expertise. *National Association of Greeting Card Publishers v. United States Postal Service*, 607 F.2d 392, 401 (D.C.Cir.1979), *cert. denied*, 444 U.S. 1025, 100 S.Ct. 688, 62 L.Ed.2d 659 (1980).

These two types of factfinding—adjudicative and legislative—often overlap and are frequently difficult to distinguish. 2 K. Davis, *Administrative Law Treatise*, § 12.3 (2d Ed.1979). Assuming, without deciding, that the determination of the award in this case was an adjudicative rather than a legislative process, we conclude that under the peculiar circumstances of

this case, Continental received all the process that was due it.

"Due process is an elusive concept. Its exact boundaries are undefinable, and its content varies according to specific factual contexts." *Woodbury v. McKinnon*, 447 F.2d 839, 843 (5th Cir.1971) (quoting *Hannah v. Larche*, 363 U.S. 420, 442, 80 S.Ct. 1502, 1514, 4 L.Ed.2d 1307 (1960)). To determine what process was due Continental we start with a consideration of the three-part balancing test adopted by the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976):

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). *See also Memphis Light, Gas and Water Division v. Craft*, 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978).

Continental's private interest in this case is an economic one. It is seeking a substantial award for providing backup air service for three and one-half months. There is no contention that the award of less than the amount claimed will significantly affect its ability to continue in business or continue as a viable corporate entity. *See Goldberg v. Kelly*, 397 U.S. 254, 263–64, 90 S.Ct. 1011, 1018, 25 L.Ed.2d 287 (1970); *Buttrey v. United States*, 690 F.2d 1170 (5th Cir. 1982), *cert. denied*, 461 U.S. 927, 103 S.Ct. 2087, 77 L.Ed.2d 298 (1983).

The third *Eldridge* factor calls for a consideration of the additional fiscal and administrative burdens placed on the Board if it is required to provide formal hearings in all applications made to it for compensation. The record does not contain the facts necessary for a reasoned analysis of this factor. We do not know the number of claims for compensation that would potentially require a hearing or any peculiar problems the Board would face if it were required to conduct a formal hearing in every case. We assume that such a requirement would place minimal burdens on the Board.

The crucial element in this balancing test when applied to this case is the second factor which requires us to balance the risk of: "An erroneous deprivation of [the private] interest through the procedures used" against the "probable value, if any, of additional or substitute procedural safeguards." 424 U.S. at 335, 96 S.Ct. at 903.

As we stated in *Buttrey* "[a]ny inquiry under the second *Eldridge* heading must necessarily be very fact-specific.... [A] slight modification of the facts, suddenly 'smack[s] ... of administrative tyranny.'" 690 F.2d at 1178.

Continental's most serious complaint is that it should have been permitted to cross-examine the staff members who prepared the audit relied upon by the Board in arriving at an award for ownership expenses. This contention requires an examination of the facts that were in dispute before the Board on this issue.[1] Broadly stated, the critical question was whether an entire airplane was devoted to the backup service for the Pago Pago run. Continental asserted that the audit figures and statistics revealed a significantly reduced utilization rate for the DC–10's in its Los Angeles fleet during the time it performed backup service. Continental attributes this reduced utilization rate to the fact that it had an extra airplane in its fleet available to provide the Pago Pago backup service. The Board agreed that the utilization of Continental's aircraft was somewhat lower during the February to May 1982 period than it had been in the summer and fall, but that "although such an aircraft was available for backup duties, it was used to back up Continental's system and not just held out for a potential Pago Pago obli-

---

1. For a further discussion of the facts related to this issue, see part IIIc *infra*.

gation." The Board, based on the opinions and judgment of its staff, concluded that the reduced utilization of the aircraft in Continental's Los Angeles fleet was not inordinately low for the winter and spring months when transcontinental air traffic is historically at its low point. The conclusion and reasoning of the staff that led it to this conclusion was fully set forth in the staff report which was issued on June 3, 1982 and to which Continental replied on July 13, 1982. Continental was given the unrestricted right to refute the staff report through the written reports of its experts and briefs of counsel. Also, Continental's counsel met face-to-face with the staff members and had every opportunity to persuade the staff members to accept their point of view or to correct any misunderstandings. It is doubtful that cross-examination of these staff auditors would have served any purpose. If skilled counsel in face-to-face meetings and multiple written submissions was unable to persuade the staff of its error and convince them to accept Continental's point of view, there is little reason to believe that cross-examination would have accomplished any purpose. The value of cross-examination " 'is often negligible where the dispute turns on matters of expert judgment rather than veracity.' " Korn, Law Fact and Science in the Courts, 66 Col.Law Rev. 1080, 1086–87 (1966), quoted in *Buttrey v. United States*, 690 F.2d 1170, 1182. We conclude therefore that there is little likelihood that cross-examination of the staff auditors would have been helpful to the Board in reaching an accurate decision.

In summary, we conclude that Continental's property interest is important but not of critical importance. The record is sparse on the additional burdens that will be placed on the agency if it is required to conduct trial-type procedures in every claim for compensation; it is reasonable to infer that the additional burdens would be minimal. Finally and most important, there is little chance that imposition of trial-type procedures with oral cross-examination of witnesses in this case would reduce the chance of error. It follows that Continen-

tal's contention that it was denied procedural due process because its demand for a formal hearing and on the record cross-examination of the Board's staff must be rejected. We also reject Continental's bare bones arguments that it was denied due process because no record was made of the informal hearings and that the Board was not impartial. The documents filed by Continental and the Board staff provide an adequate record for review. *See Coastal Airlines, Inc. v. CAB*, 709 F.2d 119, 121 (1st Cir.1983). We find no record support for Continental's argument that the Board was not an impartial decision maker. The fact that the Board relied on its own staff for assistance in evaluating Continental's claim is insufficient to support Continental's argument on this point. *Montrose Chemical Corp. v. Train*, 491 F.2d 63 (D.C. Cir.1974). We conclude that Continental was given all the process it was due under the Constitution.

### III.  SUPPORT FOR THE BOARD'S FINDINGS

■ Continental next argues that the final order of the CAB is not supported by substantial evidence. 49 U.S.C. § 1486(e). This contention requires a consideration of the record evidence.

In order to comply with the backup obligation, Continental contends that it expended sums in three areas: flight attendant costs, pilot salaries, and aircraft ownership expenses. We now turn to a consideration of the evidence and Continental's contentions in each of these categories.

### A.  *Reserve flight attendant costs.*

Continental contends that it was required to keep thirty-seven flight attendants on reserve in Los Angeles at a cost of $148,-733 to provide the backup service to Pago Pago. The Board awarded $98,991 to Continental for this item based on its conclusion that only twenty-five attendants were actually needed to fly the Pago Pago route. The Board concluded that the other twelve attendants were reserves and not actually

required to perform the essential service. Continental contends that it needed twelve reserve flight attendants to backup the twenty-five attendants needed for a flight. The Board did not abuse its discretion in awarding compensation for only twenty-five flight attendants and in declining to allow compensation for reserves to back up reserves.

## B. *Reserve pilot costs.*

Continental contends that it is entitled to $184,645 instead of the $122,226 awarded by the Board for maintaining eleven reserve pilots to satisfy the backup obligation. The Board found that from March 29, 1982, through April 30, 1982, an average of eleven pilots was maintained on standby status in Honolulu for the Pago Pago flight, but that from May 1 to May 13, 1982, an average of only 2.5 pilots was on standby in Honolulu for this purpose. The remaining 8.5 pilots for whom compensation was claimed were stationed in Los Angeles. The Board concluded that the reserve pilots stationed in Los Angeles were not used to back up the Pago Pago flight. The Board therefore awarded Continental $122,226 out of the $184,645 it claimed for this item. The Board did not abuse its discretion in reaching this conclusion.

## C. *Aircraft·ownership expenses.*

Continental finally argues that the $7,168 the Board awarded for aircraft ownership expenses is only a fraction of the $410,899 it cost Continental to own a single airplane during the backup period to comply with the backup obligation. Continental concedes that it did not keep a single identifiable aircraft ready to make the Pago Pago run. Continental contends, however, that it arranged to have extra aircraft in Los Angeles to fly the Pago Pago route if necessary. The staff audit, that was accepted by the Board, revealed that, although an aircraft was always available in Los Angeles to fly the Pago Pago run on twenty-four hours notice, that same airplane was also available to backup Conti-

nental's entire Los Angeles system. The staff found that the backup DC–10 aircraft in Los Angeles was in fact used from time-to-time to substitute for other DC–10 aircraft, for B–727 aircraft and for aircraft on military charters. Based primarily on these opinions of its staff, the Board awarded Continental a percentage of the total cost of backing up its entire Los Angeles system. This percentage was based on the ratio of air miles in the Honolulu to Pago Pago run to the air miles customarily flown by the entire Los Angeles fleet. Continental contends that if it had not been required to back up the Pago Pago flight, it would have used fewer reserve aircraft in Los Angeles and could have increased the utilization rate of its fleet. The Board did not abuse its discretion in rejecting this argument. The Board concluded that the low DC–10 utilization during the period the backup obligation was in effect did not result from the backup obligation but was caused by the seasonal nature of air traffic which peaks in the summer months and declines in the winter and spring. This conclusion was buttressed by Continental's utilization rate for DC–10 aircraft in the previous year, 1981.

Evaluating the significance of the lower utilization rate of Continental's DC–10 aircraft from December-May 1982 was largely a judgment call. The expertise of the Board was particularly helpful in making this evaluation and we are unable to say the Board abused its discretion in the method it chose to compute the award or in the conclusion it reached.

## IV.  ADDITIONAL CLAIMS FOR COMPENSATION

Continental argues that in addition to being compensated from the end of the ninety-day notice period until the termination of the backup requirement it is also entitled to compensation for fulfilling the backup requirement *during* the ninety day notice period. (January 31-March 28, 1982). It also contends that it is entitled to compensation for the cost it incurred in reintegrating the backup aircraft into its system

after the backup requirement was terminated. Continental contends that it is entitled to compensation during these time periods under the Federal Aviation Act (FAA) or alternatively under the taking clause of the fifth amendment.

■ The Board denied Continental's claim for compensation during the ninety-day notice period under the authority of section 419(a)(7)(B) of the FAA. This section provides that when a previously uncompensated carrier has been "providing air transportation to any eligible point without compensation ... the Board shall compensate such air carrier for any losses that the air carrier incurs ... *after the last day of such 90 day period....*" 49 U.S.C. § 1389(a)(7)(B) (emphasis added). Continental contends that it is entitled to compensation during this period under the provisions of section 419(a)(5) of the FAA, 49 U.S.C. § 1389(a)(5), which states that: "[t]he Board shall make payments of compensation under this subsection at times and in a manner determined by the Board to be appropriate...." In view of the clear express language of section 419(a)(7)(B), we agree with the Board that section 419(a)(5) is designed to give the Board discretion over the *timing* of the payment of compensation and does not give the Board discretion in determining the *period* for which compensation is due. Thus, we agree with the Board that the FAA does not authorize payment to Continental for costs incurred during the ninety-day notice period.

■ Continental also contends that the authorization for payment "for any losses" after the ninety-day notice period under section 419(a)(7)(B) of the Act includes the cost of reintegrating their aircraft back into their system. The Board did not abuse its discretion in denying recovery of these costs on grounds that they would have been incurred by the carrier after it terminated service along the Pago Pago route regardless of whether the backup requirement had been imposed.

■ Finally, Continental argues that the denial of compensation during the ninety-day notice period and during the reintegration period is an unconstitutional taking without just compensation under the fifth amendment. Continental relies on *Brooks-Scanlon Co. v. Railroad Commission*, 251 U.S. 396, 40 S.Ct. 183, 64 L.Ed.2d. 323 (1920), which held that the state could not force Brooks-Scanlon Company, an unprofitable railroad, to stay in business and continue operation without compensation. Today's case is readily distinguishable from *Brooks-Scanlon.* Unlike the railroad, Continental did not wish to terminate business entirely; Continental terminated service on one route and was required to provide backup service only on that single route. Justice Holmes, speaking for the Court in *Brooks-Scanlon,* recognized that: "[I]f a railroad continues to exercise the power conferred upon it by a charter from the state, the state may require it to fulfill an obligation imposed by the charter, even though fulfillment in that particular may cause a loss." 251 U.S. at 399, 40 S.Ct. at 184. *See also Railroad Commission v. Eastern Texas Railroad Co.*, 264 U.S. 79, 85–86, 44 S.Ct. 247, 248–49, 68 L.Ed. 569 (1924).

A second distinction is that in *Brooks-Scanlon* the plaintiff was forced to continue its unprofitable railroad operations indefinitely and presumably until it became insolvent, whereas Continental was only required to fulfill the backup obligation without compensation for a limited period. That limited service did not result in dire financial hardship to Continental. The Third Circuit in *Lehigh and New England Railway Co. v. ICC,* 540 F.2d 71 (3d Cir. 1976), *cert. denied,* 429 U.S. 1061, 97 S.Ct. 784, 50 L.Ed.2d 776 (1977), distinguished *Brooks-Scanlon* in a similar fashion and held that a railroad carrier could be ordered to operate without compensation *temporarily* over the lines of another carrier unable or unwilling to provide essential rail service.

It is not unreasonable to require an airline to give ninety days notice of its intention to terminate service along a particular

route. Continental could have continued flying the route during the notice period and derived revenues from that operation but chose not to do so. Ninety days notice is a reasonable governmental regulation that does not rise to the level of a "taking." "Government hardly could go on if, to some extent, values incident to property could not be diminished without paying for every such change in the general law." *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922). We conclude that the denial of compensation during the ninety-day notice period and the reintegration period does not constitute a taking under the fifth amendment.

The final order of the CAB is

AFFIRMED.