Carmelo **HERNANDEZ**,
Plaintiff–Appellee,

v.

Lee G. **CREMER, Etc., et al.,**
Defendants,

U.S. Immigration & Naturalization Service, and U.S. Department of Justice, Defendants–Appellants.

No. 89–1743.

United States Court of Appeals,
Fifth Circuit.

Oct. 2, 1990.

Alison R. Drucker, Mark C. Walters, Civil Div. Dept. of Justice, Washington, D.C., Helen M. Eversberg, U.S. Atty., San Antonio Tex., for defendants-appellants.

Alpha Hernandez, Texas Rural Legal Aid, Inc., Del Rio, Tex., for plaintiff-appellee.

Before GARZA, HIGGINBOTHAM, and DUHÉ, Circuit Judges.

DUHÉ, Circuit Judge.

The U.S. Immigration and Naturalization Service (the INS) requests relief from an injunction issued by the district court. We modify the injunction and affirm.

Carmelo Hernandez, a United States citizen born in Puerto Rico, moved to the continental United States in 1958 and lived and worked in Houston, Texas during the time relevant to this lawsuit. On November 30, 1980 Hernandez sought entry from Mexico into the United States at the International Bridge at Del Rio, Texas. INS immigration inspector James T. Blake interviewed Hernandez, who presented a Puerto Rican birth certificate and a union card with his social security number to support his claim that he was a United States citizen.[1] After examining these documents and questioning Hernandez, Blake was not satisfied that Hernandez was entitled to enter the United States and processed Hernandez for an exclusion hearing before an immigration judge.

To process Hernandez Blake filled out four INS forms and took Hernandez' fingerprints, which were sent to the Federal Bureau of Investigation. The I-122 form, the only form given to an applicant denied entry, serves as a notice to the applicant that his admission has been denied and that he has been or will be scheduled for a hearing before an immigration judge. It contains a space in which to indicate a time, date and place for a hearing if the immigration officer schedules a hearing when the applicant is processed, but if one is not scheduled at the time, space is provided for the applicant's address where a hearing notice can be mailed. The I-122 Blake completed did not schedule a hearing at the time Hernandez was processed.[2] In the space provided for the applicant's address, Blake typed in "None itinerant." A local rule in effect at the time required immigration officers to annotate on the I-122 that a list of legal aid organizations had been given to the applicant. Blake failed to make such an annotation.

The I-110 form completed by Blake and sent to an immigration judge stated that Blake had denied Hernandez' entry into the United States because the documents he presented appeared. to be counterfeit. Blake further recounted Hernandez' claim that he had lived in the United States for 22 years. Blake also indicated on the I-110 that he had provided a legal aid list to Hernandez.

Blake also completed an I-213 form, which listed Hernandez' criminal record, social security number, and identifying tattoos. The final document Blake filled out was an I-214, a "Warning, Waiver, Certification, and Interview Log Form." The purpose of the I-214 is to ensure that the applicant understands his rights and does not want an attorney present before further questioning. The warning and waiver portion of the form was written in Spanish and signed by Hernandez. The certification portion of the form was not signed, nor was the interview log portion completed.

Hernandez spent 46 days in Mexico [3] and returned frequently to the port of entry at Del Rio to determine if an immigration judge was present to hear his case. Hernandez was admitted into the United States

1. The record on appeal contains an affidavit in which Hernandez asserted under oath that during the same interview, "I told [Blake] that he could check my records; that I had been married in Michigan and that I would easily be identified with police records because I have tatoos all over my body. He just said anyone could make a birth certificate and laughed at me."

2. It is common practice not to schedule an exclusion hearing when the applicant is processed because of the irregularity with which immigration judges visit the ports of entry. Indeed, all immigration cases which arise in Del Rio are

heard in Eagle Pass by an immigration judge who travels from San Antonio; the immigration judges hear cases in Eagle Pass approximately once every two months. The district court found that, given the backlog of cases on the immigration judges' dockets, an applicant could wait considerably longer than two months for a hearing date.

3. Hernandez testified that he had very little money and knew no one in Mexico; consequently, he found odd jobs at hard labor and was paid with one meal a day. He also asserted that he lost his apartment, his clothing and his job as a roofer in Houston.

on January 15, 1981, without a formal hearing. At that time INS Inspector Donna Barnes examined Hernandez' birth certificate and discovered nothing which conclusively indicated that the document was fraudulent. She checked with the El Paso Information Center (EPIC) to determine if the document had been used in a fraudulent manner at other ports of entry. Based on information supplied by EPIC and other secondary sources, the INS withdrew its objection to Hernandez' application for admission into the United States.

Hernandez thereafter sued Lee G. Cremer, individually and as the INS officer in charge of the Del Rio port of entry, and James T. Blake, individually and as an officer of the INS. Hernandez filed an amended complaint to add a Federal Tort Claims Act claim against the INS and to add the United States Department of Justice as a party. The district court subsequently dismissed all claims against Cremer and Blake as well as the tort actions against the INS and the United States. However, the court issued an injunction against the INS San Antonio District, requiring that the INS follow certain minimal procedures when an applicant for entry into the United States presents documentary evidence which, if accepted as authentic, would conclusively establish the applicant's United States citizenship. The INS appealed to this court, claiming that oral procedures implemented following the issuance of the injunction obviated the need for such relief; we remanded for the district court to consider the necessity and scope of the injunction in light of the new procedures. After a hearing on the matter, the district court issued a final decision, ordering that the injunction initially entered remain in effect but authorizing the application of the new INS procedures in lieu of the injunction. The INS then lodged this appeal.

*Justiciability*

■ Article III of the Constitution imposes limits on the cases federal courts may hear. These include the requirement, broadly described as the justiciability doctrine, that there exist a "case or controversy." *See* U.S. Const. art. III, § 2, cl. 1;

*Flast v. Cohen*, 392 U.S. 83, 94–101, 88 S.Ct. 1942, 1949–53, 20 L.Ed.2d 947 (1968). The fundamental inquiry in determining whether a case or controversy exists is whether the "conflicting contentions of the parties ... present a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract." *Railway Mail Ass'n v. Corsi*, 326 U.S. 88, 93, 65 S.Ct. 1483, 1487, 89 L.Ed. 2072 (1945). Of the several doctrines that courts have developed to elaborate the case or controversy requirement, the requirement that a litigant have "standing" to invoke the power of a federal court "is perhaps the most important of these doctrines." *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). The core component of the standing requirement, derived directly from the Constitution, is that the plaintiff allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief. *Id.* at 751, 104 S.Ct. at 3324 (citing *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982)).

■ The INS, relying on *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), contends that Hernandez lacks standing because he has not shown that there is a reasonable likelihood that he will again suffer the alleged deprivation of Fifth Amendment due process that gave rise to this suit. Thus the argument follows that the requested relief will not redress the defendant's allegedly unlawful conduct: if this litigant will not benefit from issuance of an injunction, the case is moot. A case may circumvent the mootness doctrine if the conduct about which the plaintiff originally complained is "capable of repetition, yet evading review." *Honig v. Doe*, 484 U.S. 305, 318, 108 S.Ct. 592, 600, 98 L.Ed.2d 686 (1988) (quoting *Murphy v. Hunt*, 455 U.S. 478, 482, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982)). Conduct is capable of repetition if there is a reasonable expectation or a demonstrated probability that the same controversy will

recur. *Honig*, 484 U.S. at 318 & n. 6, 108 S.Ct. at 601 & n. 6, 98 L.Ed.2d at 704 & n. 6 (citations omitted). *See Daniel R.R. v. State Board of Education*, 874 F.2d 1036, 1040–41 (5th Cir.1989).

The INS contends that application of the Court's reasoning in *Lyons* demonstrates that Hernandez has not shown a sufficient likelihood that he will suffer a similar injury in the future. Lyons sought damages arising out of injuries he received from an illegal chokehold administered by the Los Angeles police. He also sought declaratory and injunctive relief against the city prohibiting chokeholds in all but those situations in which there is the threat of the immediate use of deadly force against the officer. The Supreme Court found Lyons lacked standing because the one episode experienced by Lyons did "nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part." *Lyons*, 461 U.S. at 106, 103 S.Ct. at 1667.

The Court found that Lyons lacked standing to seek equitable relief due to the "speculative nature of his claims that he will again experience injury as the result of that practice even if continued." *Lyons*, 461 U.S. at 109, 103 S.Ct. at 1669. The Court relied on its earlier decisions in *Golden v. Zwicker*, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969) and *Ashcroft v. Mattis*, 431 U.S. 171, 97 S.Ct. 1739, 52 L.Ed.2d 219 (1977) which held that standing to challenge a statute was not established merely by the fact that the plaintiff had on a single previous occasion been harmed by the statute's application, absent a realistic likelihood that the statute would, in the future, be applied to his own detriment. *Lyons*, 461 U.S. at 104–06, 103 S.Ct. at 1666–67. *See O'Shea v. Littleton*, 414 U.S. 488, 495–96, 94 S.Ct. 669, 675–76, 38 L.Ed.2d 674 (1974).

We find a critical factual distinction between *Lyons* and the instant case which dictate a different result. Hernandez (unlike Lyons) was engaged in an activity protected by the Constitution. *Kent v. Dulles*, 357 U.S. 116, 126–27, 78 S.Ct. 1113, 1118, 2 L.Ed.2d 1204 (1958); *Worthy v. United States*, 328 F.2d 386, 392 (5th Cir.1964). Although at present Hernandez is safely inside the United States, he is a United States citizen and is entitled to travel to and from Mexico without deprivation of his Fifth Amendment due process rights. We think there is at the very least a reasonable expectation that Hernandez will exercise his right to travel. *See Honig*, 484 U.S. at 318 & n. 6, 108 S.Ct. at 601–02 & n. 6. Indeed, Hernandez testified that he would like to return to Mexico, but did not "want to run the risk of something like this happening again."

The *Honig* Court observed that for purposes of assessing the likelihood that a defendant will re-inflict a given injury, courts

> have been unwilling to assume that the party seeking relief will repeat the type of *misconduct* that would once again place him or her at risk of that injury. See *Los Angeles v. Lyons*, 461 U.S. 95, 105–106, 103 S.Ct. 1660, 1666–1667, 75 L.Ed.2d 675 (1983) (no threat that party seeking injunction barring police use of chokeholds would be stopped again for traffic violation or other offense, or would resist arrest if stopped); *Murphy v. Hunt, supra*, 455 U.S., at 484, 102 S.Ct., at 1184 (no reason to believe that party challenging denial of pre-trial bail "will once again be in a position to demand bail"); *O'Shea v. Littleton*, 414 U.S. 488, 497, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (1974) (unlikely that parties challenging discriminatory bond-setting, sentencing, and jury-fee practices would again violate valid criminal laws).

484 U.S. at 320, 108 S.Ct. at 602 (emphasis supplied). No such reluctance, however, is warranted here. The injury alleged to have been inflicted did not result from an individual's disobedience of official instructions[4] and Hernandez was not engaged in

---

4. The trial court observed that "the Government's own witness, Mr. Lee Cremer, the former

director of the Del Rio Port of Entry, testified that Mr. Blake's action in exercising his broad

any form of misconduct; on the contrary, he was exercising a fundamental Constitutional right.

The INS argues that Hernandez will not be subject to the same alleged illegal conduct in the future because, aside from the present injunction governing INS border policy, the regional INS director has issued an oral directive which outlines proper procedures to be used when a person presenting himself at the border for admission into the country asserts that he is a citizen.[5] However, "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot." *United States v. W.T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). *See Defunis v. Odegaard*, 416 U.S. 312, 317–18, 94 S.Ct. 1704, 1706, 40 L.Ed.2d 164 (1974). Denial of injunctive relief might leave the INS "free to return to [its] old ways." *W.T. Grant*, 345 U.S. at 632, 73 S.Ct. at 897. "It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption." *United States v. Oregon State Medical Society*, 343 U.S. 326, 333, 72 S.Ct. 690, 695–96, 96 L.Ed. 978 (1952).

The current INS policy, absent the injunction, is merely oral and absolutely subject to withdrawal at the discretion of the Service's District Director. The national "policy" of the INS regarding border crossing procedure is to have no policy.[6] "Intervening events have not 'irrevocably eradicated the effects of the alleged violation.'" *City of Los Angeles v. Lyons*, 461 U.S. 95, 101, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983) (quoting *County of Los Angeles v.*

*Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979)).

The district court found that INS regulations "red flag Puerto Rican birth certificates as potentially fraudulent documents ... Every time plaintiff presents a Puerto Rican birth certificate to an immigration officer in an attempt to enter the United States in the future, he will be subject to the INS regulations which mark him as a potential alien and subject him to the unbridled discretion of an INS immigration inspector." Under these circumstances, we find that there is a reasonable expectation that Hernandez will be subject to the alleged deprivation of his Fifth Amendment due process rights in the future.

*Separation of Powers*

The notion of Article III standing implicates the doctrine of separation of powers: "[a]s the Court explained in *Valley Forge Christian College v. American United for Separation of Church and State, Inc.*, 454 U.S. 464, 471–476, 102 S.Ct. 752, 757–761, 70 L.Ed.2d 700 (1982), the 'case or controversy' requirement defines with respect to the Judicial Branch the idea of separation of powers on which the Federal Government is founded." *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). The INS argues that the district court's issuance of an injunction exhibits a lack of respect for a co-equal branch of government to which the Constitution entrusts matters of immigration and naturalization. *See* U.S. Const. art. I § 8, cls. 3, 4.

The Immigration and Nationality Act of 1952 as codified at 8 U.S.C. transferred extensive authority over immigration from Congress to the Executive branch. Section 1103(a) charges the Attorney General with the administration and enforcement of all

---

discretion to deny entry to Plaintiff was pursuant to official policy."

**5.** The current policy in the San Antonio INS District is to parole into the United States pending a hearing those applicants claiming United States citizenship who have family ties, employment, or residence in the United States. *See* 8 U.S.C. § 1182(d)(5) and 8 C.F.R. § 212.5(a)(2)(i)–(v).

**6.** The INS contends that the injunction "will serve as a barrier to future implementation in the San Antonio INS District of any national parole policy which subsequently may be adopted." However, in the event such a national policy is implemented which imposes substantially the same procedural requirements as does the injunction, the INS need only move for relief from the injunction in the district court.

laws relating to the immigration and naturalization of aliens, except insofar as power is specifically delegated to other actors. Section 1103(a) further provides that the Attorney General

> shall have the power and duty to control and guard the boundaries and borders of the United States against the illegal entry of aliens and shall, in his discretion, appoint for that purpose such number of employees of the [Immigration and Naturalization] Service as to him shall appear necessary and proper.

8 C.F.R. § 100.2(a) provides that the "Attorney General has delegated to the [INS] Commissioner ... authority to administer and enforce the Immigration and Nationality Act ... as prescribed and limited by 28 CFR § 0.105 et seq." 28 C.F.R. § 0.105 in turn provides that the INS Commissioner shall exercise the authority conferred upon the Attorney General, including the authority to issue regulations.

■ The Supreme Court has long recognized that the political branches of government have plenary authority to make rules for the admission and exclusion of aliens as an inherent concomitant of national sovereignty. *Fiallo v. Bell,* 430 U.S. 787, 792, 97 S.Ct. 1473, 1478, 52 L.Ed.2d 50 (1977); *Hampton v. Mow Sun Wong,* 426 U.S. 88, 101 n. 21, 96 S.Ct. 1895, 1904–05 n. 21, 48 L.Ed.2d 495 (1976); *Mathews v. Diaz,* 426 U.S. 67, 81, 96 S.Ct. 1883, 1892, 48 L.Ed.2d 478 (1976); *Kleindienst v. Mandel,* 408 U.S. 753, 765–66, 92 S.Ct. 2576, 2583, 33 L.Ed.2d 683 (1972); *Boutilier v. Immigration and Naturalization Service,* 387 U.S. 118, 123, 87 S.Ct. 1563, 1567, 18 L.Ed.2d 661 (1967); *Knauff v. Shaughnessy,* 338 U.S. 537, 542–43, 70 S.Ct. 309, 312–13, 94 L.Ed. 317 (1950); *Mahler v. Eby,* 264 U.S. 32, 41, 44 S.Ct. 283, 297, 68 L.Ed. 549 (1924); *Oceanic Navigation Co. v. Stranhan,* 214 U.S. 320, 339, 29 S.Ct. 671, 676, 53 L.Ed. 1013 (1909); *Ekiu v. United States,* 142 U.S. 651, 659, 12 S.Ct. 336, 338, 35 L.Ed. 1146 (1892); *The Chinese Exclusion Case,* 130 U.S. 581, 604, 9 S.Ct. 623, 629, 32 L.Ed. 1068 (1889).

The Court has observed:

> The power of congress to exclude aliens altogether from the United States, or to prescribe the terms and conditions upon which they may come to this country, and to have its declared policy in that regard enforced exclusively through executive officers, without judicial intervention, is settled by our previous adjudications.

*Lem Moon Sing v. United States,* 158 U.S. 538, 547, 15 S.Ct. 967, 970, 39 L.Ed. 1082 (1895). "Normally, Congress supplies the conditions of the privilege of entry into the United States. But because the power of exclusion of aliens is also inherent in the executive department of the sovereign, Congress may in broad terms authorize the executive to exercise the power." *Knauff v. Shaughnessy,* 338 U.S. at 543, 70 S.Ct. at 313. Consequently, "[e]xecutive officers may be entrusted with the duty of specifying the procedures for carrying out the congressional intent ... Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." *Id.* 338 U.S. at 543–44, 70 S.Ct. at 313 (citations omitted). *See Shaughnessy v. United States,* 345 U.S. 206, 212, 73 S.Ct. 625, 629, 97 L.Ed. 956, 963 (1953).

■ However, we are here faced not with the rights of an alien seeking entry into the United States but rather with the rights of a United States citizen seeking to return to his country. The right to travel outside the United States is a right within the protection of the Constitution. *Worthy v. United States,* 328 F.2d 386, 392 (5th Cir.1964). The Supreme Court has long acknowledged that the "right to travel is a part of the 'liberty' of which the citizen cannot be deprived without due process of law under the Fifth Amendment." *Kent v. Dulles,* 357 U.S. 116, 126–27, 78 S.Ct. 1113, 1118, 2 L.Ed.2d 1204 (1958). *See Regan v. Wald,* 468 U.S. 222, 244, 104 S.Ct. 3026, 3039, 82 L.Ed.2d 171 (1984); *Califano v. Torres,* 435 U.S. 1, 4 n. 6, 98 S.Ct. 906, 908 n. 6, 55 L.Ed.2d 65 (1978); *United States v. Laub,* 385 U.S. 475, 481, 87 S.Ct. 574, 578, 17 L.Ed.2d 526 (1967); *Zemel v. Rusk,* 381 U.S. 1, 14, 85 S.Ct. 1271, 1279, 14 L.Ed.2d 179 (1965); *Aptheker v. Secretary of State,*

378 U.S. 500, 517, 84 S.Ct. 1659, 1669, 12 L.Ed.2d 992 (1964). In sum, the right of a United States citizen to enter the country is a right "which the fundamental law has conferred upon him." *Worthy*, 328 F.2d at 394.

The *Kent* Court observed that when faced with "an exercise by an American citizen of an activity included in constitutional protection," it would not "readily infer that Congress gave ... unbridled discretion to grant or withhold it." 357 U.S. at 129, 78 S.Ct. at 1119–20. Indeed, where activities such as travel are involved, a court should "construe narrowly all delegated powers that curtail or dilute them." 357 U.S. at 129, 78 S.Ct. at 1120. In *Ng Fu Ho v. White*, 259 U.S. 276, 284–85, 42 S.Ct. 492, 495, 66 L.Ed. 938 (1922), the Court recognized that the threat to liberty posed by the exclusion of one claiming to be a citizen is so grave that the determination of citizenship should not be entrusted solely to executive officers. *See Chin Yow v. United States*, 208 U.S. 8, 13, 28 S.Ct. 201, 202, 52 L.Ed. 369 (1908); *Rosado v. Civiletti*, 621 F.2d 1179, 1197 (2d Cir.1980), *cert. denied*, 449 U.S. 856, 101 S.Ct. 153, 66 L.Ed.2d 70 (1980).

■ An alien and a citizen seeking entry into the United States are not owed the same process. *See Fiallo v. Bell*, 430 U.S. at 792, 97 S.Ct. at 1478; *Mathews v. Diaz*, 426 U.S. at 80, 96 S.Ct. at 1891. The former is only owed that which Congress, through the Attorney General, deems appropriate; the latter, however, is owed due process of law under the Fifth Amendment. *Kent*, 357 U.S. at 129, 78 S.Ct. at 1120; *Worthy*, 328 F.2d at 394. We thus find that persons who present themselves at the border with facially adequate documentation of United States citizenship have a right to a fair procedure reasonably calculated to produce a correct determination of their status. *Kwock Jan Fat v. White*, 253 U.S. 454, 464, 40 S.Ct. 566, 570, 64 L.Ed. 1010 (1920); *Chin Yow v. United States*, 208 U.S. 8, 13, 28 S.Ct. 201, 202, 52 L.Ed. 369 (1908). Because a citizen seeking to return to the United States must be afforded due process under the Fifth Amend-

ment, compliance with the Constitution is a matter of judicial concern, and this court may not shirk its duty merely because the injunction in this case runs against the executive branch of government. *Illinois Migrant Council v. Pilliod*, 540 F.2d 1062, 1068 (7th Cir.1976) (citing *Marbury v. Madison*, 1 Cranch (5 U.S.) 137, 170, 2 L.Ed. 60 (1803)).

### Procedural Due Process

We now turn to the pivotal issue: does the INS procedure at issue violate Hernandez' Fifth Amendment procedural due process rights? We begin by noting that "[p]rocedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976). The right to travel is a "liberty" interest within the meaning of the Fifth Amendment. *Kent v. Dulles*, 357 U.S. 116, 126–27, 78 S.Ct. 1113, 1118, 2 L.Ed.2d 1204 (1958).

■ This court has observed that " '[d]ue process is an elusive concept. Its exact boundaries are undefinable, and its content varies according to specific factual contexts.' " *Continental Air Lines, Inc. v. Dole*, 784 F.2d 1245, 1248 (5th Cir.1986) (quoting *Woodbury v. McKinnon*, 447 F.2d 839, 843 (5th Cir.1971) (quoting *Hannah v. Larche*, 363 U.S. 420, 442, 80 S.Ct. 1502, 1514, 4 L.Ed.2d 1307 (1960)). *See Washington v. Harper*, — U.S. —, —, 110 S.Ct. 1028, 1040–41, 108 L.Ed.2d 178 (1990) ("The procedural protections required by the Due Process Clause must be determined with reference to the rights and interests at stake in the particular case."); *Walters v. National Association of Radiation Survivors*, 473 U.S. 305, 320, 105 S.Ct. 3180, 3189, 87 L.Ed.2d 220 (1985) ("Our decisions establish that 'due process' is a flexible concept—that the processes required by the Clause with respect to the termination of a protected interest will vary depending upon the importance attached to the interest and the particular

circumstances under which the deprivation may occur.")

We first turn to consider the INS procedures authorized by Congress and the Executive. 8 C.F.R. § 235.1(b) provides that an applicant for entry claiming United States citizenship must establish that fact to the examining immigration officer's satisfaction. If the applicant fails to do so, he "shall thereafter be inspected as an alien." *Id.* 8 U.S.C. § 1225(b) provides that an alien may be detained for further inquiry before an immigration judge where the inspection officer is not convinced "clearly and beyond a reasonable doubt" that the alien is entitled to enter the United States.

Under current practice, when a question arises concerning the admissibility of an alien, the alien is referred by the primary inspecting INS officer for a "secondary review." It is the "secondary review" officer who makes the admissibility determination. The district court observed that under current law, "all that is required is the personal satisfaction of the immigration officer who conducts the secondary inspection. Moreover, because of the absence of regulations specifying the scope of investigation that must be conducted, there is no certainty that the decision will be formed after investigating facts brought to the attention of the officer by the applicant." The district court thus held that the failure to enact procedures for investigating the claim of an applicant who presents documentary evidence of United States citizenship and the absence of any meaningful review by superiors at the port of entry of the decision by the immigration inspector to deny the applicant entry into the United States is a violation of procedural due process under the Fifth Amendment.

To determine what process was due Hernandez we must consider the three-part balancing test adopted by the Supreme Court in *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976):

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures

used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*See Hewitt v. Helms,* 459 U.S. 460, 473, 103 S.Ct. 864, 872, 74 L.Ed.2d 675 (1983); *Ramirez–Osorio v. Immigration and Naturalization Service,* 745 F.2d 937, 945–46 (5th Cir.1984).

The individual interest at stake—the right of a citizen to re-enter the United States after lawfully traveling abroad—is fundamental. The right to travel is a part of the 'liberty' of which citizens cannot be deprived without due process of law under the Fifth Amendment. *Kent v. Dulles,* 357 U.S. at 126–27, 78 S.Ct. at 1118.

The second *Mathews* factor requires that we consider the risk of mistake inherent in the procedure under attack. The extremely broad discretion delegated to the INS concerning control over our nation's borders and the lack of any written guidelines regarding the exercise of that discretion render the decision-making process virtually standardless. The district court observed that "because of the absence of regulations specifying the scope of investigation that must be conducted, there is no certainty that the decision will be formed after investigating facts brought to the attention of the officer by the applicant." The trial court found that once an immigration officer concludes that an applicant claiming United States citizenship has failed to prove such status to the officer's satisfaction, "there exists only a remote possibility for review of that decision prior to a full hearing before an immigration judge." Thus where no minimal investigation on the part of the examining INS official is required, the risk of mistake is significant. Our analysis is colored here by the fact that the consequences of a mistaken determination may result in a lengthy exile for the citizen while he awaits final determination of his citizenship claim by an immigration judge.

Finally, we turn to consider the potential for correction by changed procedures balanced against the additional burden they would present. The injunction provides:

That the Immigration and Naturalization Service (INS) shall implement the following changes in procedure to bring their inspections within constitutional standards:

1. This order shall apply to the Del Rio, Lake Amisted, and Eagle Pass ports of entry within the San Antonio Division of the INS.

2. These procedural changes must be followed whenever an applicant seeks admission into the United States as a citizen of the United States and supports that claim with documentary evidence which by itself would establish citizenship if taken as true.

3. The following documents are examples of such evidence:

 a) birth certificate showing birth in the United States or one of its territories;

 b) United States passport;

 c) voter registration card;

 d) certificate of United States citizenship (INS Form N–560 or N–561);

 e) certificate of United States naturalization Form I–197.

4. If the inspecting officer is not satisfied that the applicant for admission is a United States citizen, the following procedures shall be utilized in addition to those procedures already required by law or regulation, before the applicant is denied entry into the United States:

 a) The inspecting officer must consult with INS bulletins and the El Paso Information Center (EPIC) to verify the applicant's claim of citizenship, the inspecting officer must also consult other available information including INS publications and manuals and phone calls to local or state police agencies, unless a supervising officer determines that it is not reasonably practical to consult these additional sources. If the supervising officer determines that these additional sources cannot be consulted, he must state in writing why it was not practical to do so.

 b) If after this information check, the inspecting officer is still not satisfied with the applicant's claim to citizenship, the Port Director or other supervising officer must review the inspecting officer's determination. The supervising officer shall review the applicant's documentary evudebce (sic) of citizenship, the information relied on by the inspecting officer in reaching the conclusion that the applicant is not entitled to enter the United States, and insure that the procedures outlined in section a) above were complied with.

 c) If the supervising officer also is not satisfied with the applicant's claim to citizenship, he shall state in writing why the applicant was denied entry into the United States.

 d) The written reasons for denial shall be provided to the applicant.

 e) This entire process of initial inspection, information check, supervisory review, and giving of written reasons for denial of entry shall conclude within twenty four (24) hours of the applicant's original presentation at the port of entry for admission into the United States.

 f) If the applicant is not admitted into the United States, he shall be advised of the procedure to obtain parole pending a hearing on his case.

 g) If the applicant is not admitted into the United States or granted parole by the Port Director, he shall be given a notice briefly explaining the hearing procedure before the Immigration Judge. If no hearing date is set, the applicant shall be notified of the date of his hearing by mail, or if he has no mailing address, advised how often he must return to the port of entry to receive further information about his hearing date.

 h) In order to comply with the new procedures mandated by this order, the INS may revise the current forms it utilizes and incorporate the new procedures into one standard form.

■ The INS makes three substantive arguments regarding the onerousness of the injunction. It first objects to paragraph 4(d), which requires that in the event an applicant's citizenship claim is rejected, the INS should provide to the applicant written reasons for the denial. The INS contends that Form I–122 is sufficient to provide such notice to the applicant. We disagree. Though the I–122 serves as a notice to the applicant that his admission has been denied, it does not require that the specific reason for denial be provided. Indeed, the I–122 provided to Hernandez only recited that he was subject to exclusion because he was "an alien immigrant not in possession of a valid immigration visa or document in lieu thereof." However, Hernandez' exclusion was based on Officer Blake's unfounded suspicion that Hernandez' Puerto Rican birth certificate was fraudulent. No such notice was given to Hernandez. The injunction provides that the modification of existing forms would suffice, and we find that only slight modification of the I–122 is needed to satisfy the notice requirement. Alternatively, the INS may give to the applicant a copy of the I–110 form, which is designed to inform the immigration judge of the reasons underlying the inspector's decision to deny entry.

The INS also objects to as overly burdensome paragraph 4(g) of the injunction, which requires that the excluded applicant be given a notice explaining the hearing procedure before the immigration judge. The INS contends that such explanation is the duty and function of the immigration judges. Nevertheless, it is not overly burdensome to require that the INS give to a rejected applicant an additional sheet of paper explaining the hearing procedure.

Paragraph 4(g) also requires that "[i]f no hearing date is set, the applicant shall be notified of the date of his hearing by mail, or if he has no mailing address, advised how often he must return to the port of entry to receive further information about his hearing date." The INS objects to this requirement because scheduling of hearings is a function vested in the Office of the Immigration Judge, which is in turn required to give notice to the government and the applicant. 8 C.F.R. § 3.17. The I–122 form currently used by the INS contains a blank to indicate a time, date and place for a hearing if the immigration officer schedules a hearing when the applicant is processed, but if a hearing is not scheduled at that time, space is provided for the applicant's address where notice can be mailed. Because existing regulations charge the Office of the Immigration Judge with the responsibility of mailing notice to the applicants, we relieve the INS of this duty. However, where an applicant has no Mexican mailing address, the INS must inform the applicant in writing how frequently he should check with the office to ascertain the date for which his hearing has been set.

In contrast to the slight additional burden imposed by the injunction about which the INS complains, the procedures there outlined will eliminate much of the risk of mistake inherent in the current procedure. By requiring that the INS utilize tools readily available to it to verify information provided by applicants claiming United States citizenship and by requiring review by a supervising officer, the injunction insures that which the Fifth Amendment guarantees: a fair procedure reasonably calculated to produce a correct determination of an applicant's status.

The INS also objects to the scope of the injunction, arguing that the trial court's list of examples of documents triggering the review process is overbroad, relying on 22 U.S.C. § 2705. That section provides:

The following documents shall have the same force and effect as proof of United States citizenship as certificates of naturalization or of citizenship issued by the Attorney General or by a court having naturalization jurisdiction:

(1) A passport, during its period of validity (if such period is the maximum period authorized by law), issued by the Secretary of State to a citizen of the United States.

(2) The report, designated as a "Report of Birth Abroad of a Citizen of the Unit-

ed States", issued by a consular officer to document a citizen born abroad.

The INS concedes, however, that § 2705 does not explicitly state that the listed documents are exclusive. In particular, the INS objects to the injunction's inclusion of voter registration cards and passports, whether valid or not.

The focus and purpose of the injunction is to provide United States citizens with procedural due process when they attempt to re-enter the country. In order to grant this protection to those applicants most likely to fall within the protected class, the injunction applies only to those applicants who support their claim of citizenship with "documentary evidence which by itself would establish citizenship if taken as true." Both voter registration cards and expired passports, if taken as true, do establish citizenship. We find that the injunction is not overbroad in this respect.

*Conclusion*

Though Congress has delegated great discretion to the Executive regarding the determination of the citizenship of persons entering the United States, the injunction issued by the district court does not infringe upon that discretion; it merely requires that a constitutionally sufficient procedure be utilized in the exercise of that discretion. Indeed, Congress does not have the power to delegate to the Executive discretion so broad that the protection of the due process clause of the Fifth Amendment is abrogated. For the foregoing reasons the injunction is

MODIFIED to delete from paragraph 4(g) the words "notified of the date of his hearing by mail, or if he has no mailing address" and as so modified is AFFIRMED.

PATRICK E. HIGGINBOTHAM, Circuit Judge, dissenting:

Carmelo Hernandez's encounter with petty officiousness, unfortunately a frequent attendant of bureaucracies, is most unfortunate. I share the majority's concern for his ill treatment and apparent denial of his constitutional rights. Our courts are open to remedy Hernandez's unfortunate and episodic encounter. It does not follow, however, that the superintending injunction issued by the district court should be affirmed.

This case is controlled by *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). Whether Hernandez will encounter this treatment again is highly speculative and remote, and that is the inquiry required by the *Lyons* decision. With deference, I cannot agree that *Lyons* is distinguishable because Hernandez was engaged in constitutionally protected conduct. Lyons also enjoyed a constitutional right not to be subjected to the excessive force of the choke-hold. The decision in *Lyons* does not rest on the legality or constitutional protection of the plaintiff's conduct. *Lyons* instead mandates an inquiry into the likelihood that the single plaintiff will incur the difficulty again. Such an inquiry is compelled by basic notions of Article III standing as well as by fundamental equitable principles controlling the issuing of injunctions.

The matter of immigration and entry into the United States is largely the business of the Executive Branch of government. We should be cautious in issuing superintending injunctions that supplant its primary regulatory responsibility. Although we must not shrink from ruling upon constitutional issues, we must remain ever sensitive to the limited judicial role. The superintending injunction, escaping the adversarial contest of plaintiff versus defendant, quickly becomes a contest between the judiciary and a coordinate branch of government, with the judge acting less and less as a referee and more and more as a regulator.

It is no accident that Hernandez did not bring a class action. On these facts, the district court could not have properly certified a class under Rule 23 of the Federal Rules of Civil Procedure. The record is bereft of any suggestion that Hernandez's experience was shared by others. I would reverse the district court's grant of an injunction.