UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 93-2340

PUERTO RICO AQUEDUCT AND SEWER AUTHORITY,

Petitioner,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE ENVIRONMENTAL APPEALS BOARD

Before

Selya and Cyr, Circuit Judges,

and Pettine,* Senior District Judge.

Neil T. Proto, with whom John B. Britton, Lisa K. Hsiao,

Verner, Liipfert, Bernhard, McPherson & Hand, Chartered, Edgar

Rodriguez-Mendez, and Jorge Marrero-Narvaez were on brief, for

petitioner.
Michael J. Zevenbergen, Attorney, U.S. Dep't of Justice

Environmental Defense Section, with whom Lois J. Schiffer, Acting

Assistant Attorney General, Stephen J. Sweeney (Office of General

Counsel, EPA), and Janice Whitney (Office of Regional Counsel,

EPA Region II), were on brief, for respondent.

August 31, 1994

*Of the District of Rhode Island, sitting by designation.

SELYA, Circuit Judge. The United States Environmental
SELYA, Circuit Judge.

Protection Agency (EPA), respondent before us, refused to hold an

evidentiary hearing regarding its determination that a facility

in Mayaguez owned by petitioner, Puerto Rico Aqueduct and Sewer

Authority (PRASA), must fully meet the Clean Water Act's

secondary treatment requirements for publicly owned treatment

works (POTWs). The gist of EPA's decision was straightforward:

having previously established secondary treatment requirements

because PRASA's POTW emitted pollutants into stressed waters, it

determined that PRASA had failed to proffer any legally

cognizable basis for modifying the requirements.

Petitioner now seeks judicial review of this

determination. Its flagship objection demands that we place in

bold relief the concept of administrative summary judgment.

Petitioner's less touted objections implicate the agency's

"stressed waters" standards.1 Descrying no flaw in EPA's

application of either its procedural or substantive regulations,

we affirm.

I. STATUTORY AND REGULATORY FRAMEWORK

Under the Clean Water Act, no pollutant may be emitted

into this nation's waters except in compliance with a National

Pollution Discharge Elimination System (NPDES) permit. See 33

U.S.C. 1311(a) (1988). Ordinarily, the NPDES permit issued to

1"Stressed waters" are "those receiving environments in
which an applicant can demonstrate to the satisfaction of the
Administrator, that the absence of a balanced, indigenous
population is caused solely by human perturbations other than the
applicant's modified discharge." 40 C.F.R. 125.58(t) (1993).

2

a POTW includes certain technology-based standards known as

secondary treatment requirements. See id. 1311(b)(1)(B). A

POTW can obtain relief from these requirements by meeting nine

separate criteria. These criteria are limned in 33 U.S.C.

1311(h). They require the applicant to make various

demonstrations regarding matters such as: the effects of the

discharge on other sources and on marine life; standards and

procedures for monitoring the discharge; and methods of ensuring

control over the sources introducing waste into the POTW. Of

this ennead, only the second criterion, embodied in section

1311(h)(2), is relevant to this appeal.2

To satisfy section 1311(h)(2), a POTW must show that

the discharge of pollutants in accordance
with such modified requirements will not
interfere, alone or in combination with
pollutants from other sources, with the
attainment or maintenance of that water
quality which assures protection of public
water supplies and the protection and
propagation of a balanced, indigenous
population of shellfish, fish, and wildlife,
and allows recreational activities, in and on
the water . . . .

33 U.S.C. 1311(h)(2) (1988). The information necessary for a

section 1311(h)(2) demonstration is described by the implementing

2While EPA's initial decision may be read to rest in part on
PRASA's failure to satisfy subsections 1311(h)(1) and (h)(9), as
well as (h)(2), the Environmental Appeals Board did not reach
those issues, see In re Mayaguez Regional Sewage Treatment Plant,

NPDES Appeal No. 92-93 (August 23, 1993), slip op. at 9 n.13.
Since the initial decision constitutes final agency action only
when the Board denies review or summarily affirms, see 40 C.F.R.

124.91(f) (1993), not where, as here, the Board writes a full
opinion, we decline EPA's invitation that we decide the case
under either (h)(1) or (h)(9).

3

regulation, under which an applicant who cannot meet the

requirements of 40 C.F.R. 125.61(a)-(e) due to "human

perturbations" other than its modified discharge must meet the

stressed waters requirements of 40 C.F.R. 125.61(f). Under

these requirements, the applicant must demonstrate that its

discharge will not:

(1) contribute to, increase, or perpetuate
such stressed conditions;

(2) contribute to further degradation of the
biota or water quality if the level of human
perturbation from other sources increases;
and

(3) retard the recovery of the biota or water
quality if the level of human perturbation
from other sources decreases.

40 C.F.R. 125.61(f) (1993). For ease of comprehension, we

sometimes will refer to the (f)(1) showing as the "current

impacts" showing and the (f)(3) showing as the "future impacts"

showing. Although the (f)(2) showing would seem to be intimately

related to the (f)(3) showing, it was not discussed in the

proceedings below and, therefore, is not a matter of current

concern.

Unlike typical NPDES permit proceedings, EPA makes a

tentative decision to grant or deny section 1311(h) modifications

prior to proposing a permit. See 40 C.F.R. 125.59(d) (1993).

A POTW that has submitted a timely application for such

modification may revise it once as of right. See id.

125.59(d)(1). EPA also may authorize or request the submission

of additional information. See id. 125.59(f)(1).

4

After issuance of a tentative decision, followed by

public notice and opportunity for written comment, EPA makes a

final determination in regard to the proposed action. See 40

C.F.R. 124.15 (1993). That decision becomes the final permit,

effective in thirty days, unless it is administratively appealed.

See id. 124.15(b). If an appeal is taken, a party may request

an evidentiary hearing to contest the resolution of any question

raised in the earlier proceedings. See id. 124.74(a). The

request must specifically identify the legal and factual issues

and their relevance to the permit decision. Id. 124.75(b)(1).

EPA's Regional Administrator then grants or denies the request.

Id. 124.75(a)(1).

If a request for an evidentiary hearing is denied, the

denial becomes final agency action within thirty days unless a

protest is filed with the Environmental Appeals Board (the

Board). See id. 124.60(c)(5), 124.91. In turn, an order by

the Board abjuring review renders final the Regional

Administrator's previous decision. See id. 124.91(f)(1).

II. PROCEDURAL BACKGROUND

This case aptly illustrates how the regulatory scheme

works. PRASA initially sought a section 1311(h) modification for

its Mayaguez sewage facility by application dated September 13,

1979. EPA, hampered by delays in obtaining input from local

environmental officials, did not issue a tentative denial of the

request until February 6, 1984. One year later, after PRASA

presented a revised application, EPA issued another tentative

5

denial. On December 13, 1991, following notice, comment, and a

two-day public hearing, EPA dashed PRASA's hopes by issuing a

final denial of its request for modification.

Hope, of course, often springs eternal, see Alexander

Pope, An Essay on Man, Epistle 1 (1734), and PRASA's hopes of

obtaining a modification were renewed in 1992 by a United States

Geological Survey (USGS) report that contained some conclusions

helpful to PRASA's cause. PRASA commenced its administrative

appeal of EPA's final denial by submitting a request for an

evidentiary hearing accompanied by the draft USGS study. On July

23, 1992, the USGS report notwithstanding, EPA Region II rejected

PRASA's request for an evidentiary hearing. The Board affirmed.

See In re Mayaguez Regional Sewage Treatment Plant, NPDES Appeal

No. 92-93 (August 23, 1993) (Board Op.). PRASA immediately

invoked 33 U.S.C. 1369(b) and petitioned for judicial review.

In a passage that frames the central battleground in

this venue, the Board self-consciously construed the procedural

standard governing requests for evidentiary hearings, 40 C.F.R.

124.75, to necessitate the presence of a "genuine issue of

material fact" as a prerequisite to avoiding summary disposition

of requests for review, Board Op. at 11. The Board characterized

this requirement as "very similar to the requirement set forth in

Rule 56 of the Federal Rules of Civil Procedure." Id.; see also

id. at 13 (explaining that the Board's standard and the Rule 56

standard are "for our purposes virtually identical"). Warming to

the task, the Board lauded case law dealing with Rule 56 as

6

offering "useful guidance" in connection with section 124.75, id.

at 11, and proclaimed that the Rule 56 standard "should be

applied in the context of evidentiary hearing requests as well,"

id. at 13.

Scrutinizing the record through this prism, the Board

held that PRASA did not merit a hearing because it had not

presented a genuine issue of material fact as to either the

current impacts showing required under 40 C.F.R. 125.61(f)(1)

or the future impacts showing required under 40 C.F.R.

125.61(f)(3). Put another way, the Board thought that no

evidentiary hearing should be convened because PRASA had not

adduced sufficient proof from which a reasonable decisionmaker

could find, by a preponderance of the evidence,3 either that the

Mayaguez POTW was not currently contributing to the stressed

condition of the surrounding waters, or that the facility would

not in the future inhibit recovery of the surrounding stressed

waters in the event that other stresses relented. See id. at 15-

18. This ruling was tantamount to the entry of summary judgment,

effectively terminating PRASA's administrative appeal.

III. STANDARD OF REVIEW

We are mindful that we operate at the busy intersection

of three deferential standards of review. In the first place,

3The Board routinely applies the preponderance standard in
permit determinations. See Board Op. at 13 n.18. This is of

some consequence for present purposes because Rule 56 frequently
implicates the substantive burdens of proof that would apply if
the particular case went forward uninterrupted. See Villanueva

v. Wellesley Coll., 930 F.2d 124, 129 (1st Cir.), cert. denied,

112 S. Ct. 181 (1991).

7

agency decisions made by informal adjudication may be set aside

only if they are "arbitrary, capricious, an abuse of discretion,

or otherwise not in accordance with law." 5 U.S.C. 706(2)(A)

(1988); see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut.

Auto. Ins. Co., 463 U.S. 29, 43 (1983); Sierra Club v. Marsh, 976

F.2d 763, 769 (1st Cir. 1992). In the second place, an agency

deserves an extra measure of deference with regard to factual

questions involving scientific matters in its area of expertise.

See, e.g., Baltimore Gas & Elec. Co. v. NRDC, 462 U.S. 87, 103

(1983); FPC v. Florida Power & Light Co., 404 U.S. 453, 463

(1972); Town of Brookline v. Gorsuch, 667 F.2d 215, 219-20 (1st

Cir. 1981). Mixed questions of law and fact, at least to the

extent that they are fact-dominated, fall under this rubric. See

Gorsuch, 667 F.2d at 220; cf. In re Howard, 996 F.2d 1320, 1327-

28 (1st Cir. 1993) (recognizing that appeals in the federal court

system are usually arrayed along a degree-of-deference continuum

in which deference increases in proportion to the factual

component of the determination). And, finally, the respect

usually accorded an agency's interpretation of a statute it is

charged to execute, see Chevron U.S.A. Inc. v. NRDC, 467 U.S.

837, 842-45 (1984), is magnified when the agency interprets its

own regulations, see, e.g., Arkansas v. Oklahoma, 112 S. Ct.

1046, 1059-60 (1992); Commonwealth of Mass., DPW v. Secretary of

Agric., 984 F.2d 514, 524 (1st Cir. 1993) (citing cases).

IV. ADMINISTRATIVE SUMMARY JUDGMENT

In this court, PRASA hawks most vigorously a claim of

8

procedural error. This claim spotlights the Board's

interpretation of EPA's standard for dispensing (or dispensing

with) evidentiary hearings, especially its conclusion that the

text of the applicable regulation, 40 C.F.R. 124.75(a)(1)

(stipulating that, to warrant an evidentiary hearing and deflect

administrative summary judgment, the non-moving party must

establish the existence of "material issues of fact relevant to

the issuance of the permit"), should be read as the functional

equivalent of Fed. R. Civ. P. 56(c) (which authorizes summary

judgment if there is "no genuine issue as to any material fact,"

and thereby requires the non-moving party to establish the

existence of a genuinely disputed material fact to forestall

summary judgment). Section 124.75, PRASA asserts, contains no

"genuineness" requirement, and, moreover, even if the Board had

the authority to read a "genuineness" requirement into the

regulation, it could not do so without giving advance notice. We

find no merit in these assertions.

The Structure of Administrative Summary Judgment

In erecting an adjudicatory framework that included an

administrative summary judgment procedure, EPA necessarily

contemplated that, to qualify for an evidentiary hearing, a party

would have to present a genuine and material dispute. Those two

requirements are inherent in the very concept of administrative

summary judgment. Any other assumption borders on the

chimerical: under federal case law, a "material" fact is one

that may affect the outcome of the case, see Anderson v. Liberty

9

Lobby, Inc., 477 U.S. 242, 248 (1986); United States v. One

Parcel of Real Property, 960 F.2d 200, 204 (1st Cir. 1992); a

"genuine" fact dispute is one that a reasonable decisionmaker

could decide in favor of either party under the applicable

standard of proof, or in other words, one that is worthy of being

more fully adjudicated (trialworthy in the courts' parlance;

hearing-worthy in the agencies' parlance).4 See Liberty Lobby,

477 U.S. at 248-49; One Parcel, 960 F.2d at 204. To force an

agency fully to adjudicate a dispute that is patently frivolous,

or that can be resolved in only one way, or that can have no

bearing on the disposition of the case, would be mindless, and

would suffocate the root purpose for making available a summary

procedure. Indeed, to argue as does petitioner that a

speculative or purely theoretical dispute in other words, a

non-genuine dispute can derail summary judgment is sheer

persiflage.

We think that EPA's regulations lawfully can be read to

incorporate this binary test, featuring genuineness and

materiality. What is more, we refuse to attach talismanic

significance to the absence of the stock phrase "genuine issue of

material fact." The reference found in 40 C.F.R. 124.75(a)(1)

to "material" issues of "relevant" fact achieves precisely the

same end. In practice, courts and agencies regularly use a

variety of terms to describe the two pillars of summary judgment.

4While these definitions developed in the milieu of Rule 56,
they are by no means limited to that milieu.

10

We hasten to add that, despite this linguistic

equivalency, explicitly drawing a connection to Rule 56

accomplishes three things. First, it provides a common

vocabulary, easily understandable by litigants, lawyers, and

adjudicators. Second, it introduces into an agency's

jurisprudence a ready-made ensemble of decisional precedents

associated with Rule 56, see, e.g., Garside v. Osco Drug, Inc.,

895 F.2d 46, 48 (1st Cir. 1990) (holding that at the summary

judgment stage the evidence must be examined in the light most

favorable to the nonmovant). Third, it carries with it certain

expectations, conditioned by everyday experience in the federal

courts, about the kind and degree of evidence deemed necessary to

create a genuine dispute over a material fact. See, e.g.,

Liberty Lobby, 477 U.S. at 249-50 (explaining that to withstand

summary judgment, evidence must be "significantly probative");

Garside, 895 F.2d at 49-50 (discussing type and kind of opinion

evidence that may forestall summary judgment).

Notwithstanding the obvious advantages of drawing a

parallel between the courts' and the agencies' versions of

summary judgment, petitioner contends that the Board went too far

too fast. In support, PRASA posits three interrelated arguments:

(1) that summary judgment, as it exists in the courts, has no

legitimate place in agency practice; (2) that administrative

summary judgment does not carry with it the baggage of Rule 56;

and (3) that, in all events, EPA took an impermissible shortcut

and embraced a Rule 56 standard precipitously, without affording

11

fair notice or an opportunity to respond. These arguments lack

force.

The Validity of Administrative Summary Judgment

The choice between summary judgment and full

adjudication in virtually any context reflects a balancing of

the value of efficiency against the values of accuracy and

fairness. Seen in that light, summary judgment often makes

especially good sense in an administrative forum, for, given the

volume of matters coursing through an agency's hallways,

efficiency is perhaps more central to an agency than to a court.

See Charles C. Ames & Steven C. McCracken, Framing Regulatory

Standards to Avoid Formal Adjudication: The FDA As a Case Study,

64 Cal. L. Rev. 14, 34-35 (1976). At the same time, summary

judgment is less jarring in the administrative context; after

all, even under optimal conditions, agencies do not afford

parties full-dress jury trials. Taking these factors into

account, it is unsurprising that most major agencies in the

federal system have opted to make available procedures for the

summary disposition of adjudicatory matters. See, e.g., 10

C.F.R. 2.749 (1994) (NRC); 16 C.F.R. 3.24 (1994) (FTC); 21

C.F.R. 12.93 (1994) (FDA); 47 C.F.R. 1.251 (1993) (FCC); 40

C.F.R. 22.20, 124.75, 164.91 (1993) (EPA); 29 C.F.R. 102.35(h)

(1993) (NLRB); 29 C.F.R. 2200.2 (1993) (OSHA).5

5An important exception is the SEC. See Rules of Practice,

Exchange Act Release No. 33,163 [1993 Transfer Binder] Fed. Sec.
L. Rep. (CCH) 85,257, at 84,742 (Nov. 5, 1993) (rejecting Rule
56 model on grounds that SEC practice does not permit discovery
or prehearing affidavits).

12

Administrative summary judgment is not only widely

accepted, but also intrinsically valid. An agency's choice of

such a procedural device is deserving of deference under "the

very basic tenet of administrative law that agencies should be

free to fashion their own rules of procedure." Vermont Yankee

Nuclear Power Corp. v. NRDC, 435 U.S. 519, 544 (1978). Applying

this tenet, the Court has upheld an assortment of summary

procedures, some closely resembling Rule 56, in the face of

claims that the procedures are invalid because they deprive

parties of their "right" to a hearing before the agency. See

Heckler v. Campbell, 461 U.S. 458, 467 (1983); National Indep.

Coal Operators' Ass'n v. Kleppe, 423 U.S. 388, 398-99 (1976); FPC

v. Texaco Inc., 377 U.S. 33, 39-44 (1964); United States v.

Storer Broadcasting Co., 351 U.S. 192, 205 (1956); see also Ames

& McCracken, supra, at 41 n.164 (listing cases to similar effect

involving different agencies). Most significantly for our

purposes, the Court has given its seal of approval to a highly

analogous summary procedure for denial of a hearing, see

Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S. 609, 621

(1973) (involving FDA's procedure for administrative summary

judgment), and to an earlier version of the very procedure that

we review today, see Costle v. Pacific Legal Found., 445 U.S.

198, 214 (1980).6

6Costle dealt with the direct ancestor of 40 C.F.R.

125.75(a)(1), namely, 40 C.F.R. 125.36(c)(1)(ii) (1979). The
Court held that the EPA lawfully could "limit any adjudicatory
hearing to the situation where an interested party raises a
material issue of fact." 445 U.S. at 214.

13

Petitioner's claim of invalidity consists mainly of

rhetorical flourishes and cannot scale this mountain of case law.

Due process simply does not require an agency to convene an

evidentiary hearing when it appears conclusively from the papers

that, on the available evidence, the case only can be decided one

way. See Hynson, 412 U.S. at 621. It follows that

administrative summary judgment, properly configured, is an

acceptable procedural device.

Applicability of Rule 56 Precedents

Petitioner's attempt to break the bond between

administrative summary judgment and its courtroom counterpart is

similarly unavailing. From its inception, the concept of

administrative summary judgment has been linked inextricably to

Fed. R. Civ. P. 56. In all probability, it was Professor Davis

who first forged this link. He wrote: "Some agencies might well

take a leaf from the federal rules of civil procedure and permit

summary judgment without evidence when no issue of fact is

presented." 1 Kenneth C. Davis, Administrative Law Treatise

8.13, at 578 (1958). A dozen years later, two other leading

administrative law scholars seized upon this sentence and

developed it into a highly influential report to the Committee on

Agency Organization and Procedure of the Administrative

Conference of the United States. See Ernest Gellhorn & William

F. Robinson, Jr., Summary Judgment in Administrative

Adjudication, 84 Harv. L. Rev. 612 (1971) (rendering the report

in article form).

14

Consistent with the circumstances of its birth,

administrative summary judgment has maintained a close

relationship with Rule 56. Many agencies habitually look to Rule

56 case law for guidance in respect to administrative summary

judgments. See, e.g., Phillips Pipe Line Co. v. Phillips Pipe

Co., 1994 FERC LEXIS 757, at *3 (April 26, 1994) (applying 18

C.F.R. 385.217); United States v. Scotto Bros. Woodbury

Restaurant, Inc., 1993 OCAHO LEXIS 95, at *14 (December 7, 1993)

(outlining practice in Executive Office for Immigration Review).

Other agencies, like EPA in the present context, have taken the

step of formalizing the relationship. See, e.g., 29 C.F.R.

2200.2 (1993) (making Rule 56 directly applicable to proceedings

before OSHA); see also In re Summary Decision Procedures, 34

F.C.C.2d 485, 487-88 (1972) (characterizing an FCC summary

disposition regulation, 47 C.F.R. 1.251(a)(1), as "essentially

the same" as Rule 56).

In view of this history, one respected court has gone

so far as to say, perhaps overbroadly, that the principles of

summary judgment outlined in Liberty Lobby "apply with equal

force in the context of administrative judgment." John D.

Copanos & Sons, Inc. v. FDA, 854 F.2d 510, 523 (D.C. Cir. 1988).

We take a more circumspect view. In our opinion, Rule 56 is the

prototype for administrative summary judgment procedures, and the

jurisprudence that has grown up around Rule 56 is, therefore, the

most fertile source of information about administrative summary

judgment. Thus, "[w]ith minor individual modifications, the

15

summary judgment procedures should be similar in most agencies

[to those under Rule 56]." 1 Charles H. Koch, Jr.,

Administrative Law & Practice 5.78, at 419 (1985). Hence, we

reject petitioner's contention that Rule 56 precedents are

inapposite in proceedings before administrative agencies.

Departure from Precedent

The linchpin of petitioner's final procedural argument

is the notion that the Board broke new ground in patterning its

inquiry after Rule 56. We disagree.

It is well established that agencies are free to

announce and develop rules in an adjudicatory setting. See,

e.g., NLRB v. Bell Aerospace Co., 416 U.S. 267, 294 (1974). Of

course, there are limits on this freedom. As a general matter,

when an adjudicating agency retroactively applies a new legal

standard that significantly alters the rules of the game, the

agency is obliged to give litigants proper notice and a

meaningful opportunity to adjust.7 See, e.g., Aero Mayflower

Transit Co. v. ICC, 699 F.2d 938, 942 (7th Cir. 1983); Hatch v.

FERC, 654 F.2d 825, 835 (D.C. Cir. 1981). By the same token, an

agency "cannot depart significantly from prior precedent `without

explicitly recognizing that it is doing so and explaining why.'"

Congreso de Uniones Industriales v. NLRB, 966 F.2d 36, 39 (1st

7While this requirement derives in part from a section of
the Administrative Procedure Act that applies only to full-
fledged hearings, see 5 U.S.C. 554(b)(3) (1988), the

requirement is grounded on general considerations of fairness.
Accordingly, we see no reason why it should not also apply to
adjudicative proceedings.

16

Cir. 1992) (citation omitted); accord Davila-Bardales v. INS,

F.3d , (1st Cir. 1994) [No. 93-2124, slip op. at 8].

These principles do not assist petitioner's cause.

Though petitioner asseverates that, in the proceedings below, EPA

abruptly adopted a new legal standard that substantially changed

the showing required of a party seeking an evidentiary hearing,

this scenario is more imagined than real. Here, the record

reflects neither a departure from precedent nor an alteration of

the required showing. To the contrary, the Board's approach to

section 124.75 proceeds naturally from its earlier construction

of the provision and falls well within the mainstream of its

previously established practice. We explain briefly.

Although the Board never before has made the equation

between Rule 56 and EPA's summary judgment procedure so explicit,

it traditionally has equated its procedural standard for denial

of an evidentiary hearing anent an NPDES permit with the Rule 56

yardstick. On at least three prior occasions, the Board

suggested that section 124.75's reference to the presentation of

"material issues of fact relevant to the issuance of the permit"

requires the nonmovant to set forth a "genuine issue of material

fact." See In re City of Jacksonville, Etc., NPDES Appeal No.

91-19 (Aug. 4, 1992), slip op. at 2; In re Miami-Dade Water &

Sewer Auth. Dep't, NPDES Appeal No. 91-14 (July 27, 1992), slip

op. at 17; In re Great Lakes Chem. Corp., NPDES Appeal No. 84-8

17

(Sept. 3, 1985), slip op. at 4.8

Then, too, EPA has long espoused the view, in a wide

variety of settings, that while the Civil Rules are not binding

on agencies, they may inform administrative practice in

appropriate situations. See, e.g., In re Harmon Elecs., Inc.,

1993 RCRA LEXIS 113 at *9-*10 (Aug. 17, 1993); In re Premier

Metal Prods., 1992 RCRA LEXIS 156, at *2 (Dec. 23, 1992). This

is an approach rather consistently followed both by EPA, see,

e.g., In re Wego Chem. & Mineral Corp., 1993 TSCA LEXIS 91, at

*25-*26 (Feb. 24, 1993), and by the federal courts, see, e.g.,

Amberg v. FDIC, 934 F.2d 681, 685 (5th Cir. 1991) (suggesting

that administrative decisionmakers should look for guidance to

the Civil Rules when interpreting regulations containing concepts

or language derived in part from those rules).

In sum, the procedure to which PRASA objects did not

spring suddenly and unannounced from EPA's bureaucratic brow.

Rather, by the time that the agency decided this case, the

concept that only the presence of a genuine issue about a

material fact could forestall brevis disposition had taken deep

8Great Lakes is of special interest, for in that case the

EPA made manifest that it considered the term "material" as used
in section 124.75 to be akin to the federal courts' definition of
"genuine" under Rule 56. After making a casual reference to Rule
56's language, the Board concluded, using the terms contained in
section 124.75, that the petitioner's evidence was "relevant" but
not "material." It was not "material," the Board explained,
because "evidentiary hearings [should not] be granted whenever a
party makes a bare assertion, without anything more, that a
permit's monitoring requirements should be reduced or modified
this would hopelessly crowd hearing dockets and clearly is not in
accord with the purposes of . . . the Agency's regulations."
Great Lakes, at 14.

18

root in administrative soil. Thus, PRASA should have known all

along that it would be expected to present a genuine and material

dispute in order to earn an evidentiary hearing. Though the

Board had never before invoked Rule 56 in haec verba as a guide

to section 124.75, any reasonable litigant familiar with

administrative practice in general and with EPA's precedents in

particular should have anticipated that it would be required to

present evidence adequate to overcome the functional equivalent

of a Rule 56 motion.9

Little more need be said. The Board's use of Rule 56

here was consistent both with its prior practice and with

prevalent understandings of administrative summary judgment.

Thus, the Board's articulation, albeit "new" in a certain sense,

falls well within the range of hitherto unspoken principles that

appropriately may be announced in the course of rendering an

adjudicative determination. See Bell Aerospace, 416 U.S. at 294;

SEC v. Chenery Corp., 332 U.S. 194, 202-03 (1947); Molina v. INS,

981 F.2d 14, 22-23 (1st Cir. 1992).

In the last analysis, courts must take a practical,

commonsense view of the restrictions that constrain an agency's

freedom to alter prior practices. Those restrictions, properly

construed, do not lock an agency into a position where it

9In any event, to the extent (if at all) that PRASA failed
to realize that Rule 56 would inform the Board's decision about
whether to hold a hearing, we fail to see how it was prejudiced.
For aught that appears, PRASA's evidentiary presentation would
not have differed; to this date it has been unable to deterrate
any proof sufficient to create a genuine issue about either
current or future impacts.

19

invariably must parrot the same phrases or perpetually chant the

same mantra. Reasonable refinement and reformulation are both

permissible and advisable in administrative adjudication.

Nothing more transpired here.

V. THE STRESSED WATERS SHOWINGS

We now move from the procedural to the substantive. In

scrutinizing an order of an agency denying an evidentiary

hearing, a reviewing court must determine whether the agency's

findings accurately mirror the record, and if they do, whether

those findings warrant denial of a hearing under the pertinent

regulations. See Hynson, 412 U.S. at 622. In this instance, the

first part of the inquiry tells the tale, for, if PRASA failed to

present evidence adequate to create a genuine issue of material

fact on one or more critical criteria, as EPA found, then EPA

properly denied the requested hearing.

The Future Impacts Showing

Under 40 C.F.R. 125.61(f)(3), it was incumbent upon

PRASA to show, inter alia, that the emissions from the Mayaguez

POTW would not "retard the recovery of the biota or water quality

if the level of human perturbation from other sources decreases."

In promulgating this requirement, EPA recognized that it was

erecting a high hurdle. Indeed, it stated in a preamble to the

regulations:

As a practical matter, it will be extremely
difficult for most applicants discharging
into stressed waters to demonstrate that
their discharge will meet the requirements of
section 125.61. As a factual matter, the
discharge of additional pollutants into an

20

already polluted marine environment virtually
always increases or contributes to adverse
impact; it is extremely difficult, as a
practical matter, to demonstrate that it does
not.

44 Fed. Reg. 34,784, 34,806 (June 15, 1979).

EPA concluded that PRASA had not cleared this hurdle,

and the Board concurred. It noted that the studies submitted by

petitioner principally the USGS report addressed only the

current impacts of the facility's emissions relative to the

current impacts of all other emissions, and did not purport to

make predictions regarding future impacts. See Board Op. at 15-

16. Accordingly, without defining exactly what type of evidence

might surmount the (f)(3) hurdle, the Board determined that

petitioner's effort came up short. If this determination holds

water, then the agency had a right summarily to deny the

petition.10

This reasoning finds a striking parallel in Hynson.

There the Court agreed that an agency was not required to

"provide a formal hearing where it is apparent at the threshold

10PRASA makes a rather convoluted threshold argument that
implicates the order of the showings which must be made to secure
modification of secondary treatment requirements. In this case,
we doubt that the order of the showings makes the slightest
difference. Moreover, there is absolutely no basis for believing
either that the showings must be made in a particular sequence,
or that separate hearings must be held for each showing. Absent
a contrary indication in the regulation itself and none exists
here we think it is fair to assume that a party must satisfy
every element of a provision written in the conjunctive. See

WJM, Inc. v. Massachusetts DPW, 840 F.2d 996, 1011 (1st Cir.

1988); Donovan v. Burger King Corp., 672 F.2d 221, 227 (1st Cir.

1982); see also 1A Norman J. Singer, Sutherland Stat. Constr.

21.14 (5th ed. 1993).

21

that the applicant has not tendered any evidence which on its

face meets the statutory standards as particularized by the

regulations," Hynson, 412 U.S. at 620 (emphasis in the original).

Spurred by Hynson, see id. at 621 n.17, FDA soon thereafter

announced that, with regard to an imprecise regulation, a study

would not conclusively be deemed inadequate unless it totally

failed "even to attempt to comply." See 39 Fed. Reg. 9757 (Mar.

13, 1974). Since that time, the courts have upheld FDA's summary

denials of hearings under this policy. As the District of

Columbia Circuit explained:

[E]ven "a regulatory provision which seems
vague in the abstract may nonetheless be
conclusively at odds with a peculiarly
deficient item of evidence." Thus . . .
summary judgment may be entered not only for
failure to comply with precise regulations,
but also "on the basis of manifest
noncompliance with general statutory or
regulatory provisions . . . ."

Copanos, 854 F.2d at 522 (citations omitted). We agree.

Although in some cases an imprecise regulation may require an

agency to give an applicant the benefit of the doubt regarding a

summary decision, other cases will be so clear-cut as to warrant

summary adverse action, notwithstanding the imprecision in the

agency's standards. We believe the present case falls into the

heartland of the latter category.

The Board's reasoning is also hauntingly reminiscent of

Buttrey v. United States, 690 F.2d 1170 (5th Cir. 1982), cert.

denied, 461 U.S. 927 (1983), a case involving the Clean Water

Act. There, the court of appeals agreed that the Army Corps of

22

Engineers need not hold a hearing on every application for a

permit to discharge dredged or fill material into navigable

waters. Id. at 1174-83. One reason given was that the

petitioner

apparently decided not even to attempt to
make the three showings required under [the
applicable regulations]. Procedural
improvements in the nature of trial-type
safeguards could do nothing to remedy so
fundamental a flaw in the prima facie case.

Id. at 1183 (footnote omitted).

PRASA does not deny that its studies failed to draw

direct conclusions regarding future impacts.11 Instead, it

attempts to discredit EPA's interpretation of the future impacts

regulation, labelling it absolutist. This fusillade misses the

mark. Though an absolutist interpretation, rendering

modifications of secondary treatment requirements for emissions

into stressed waters unobtainable, might well be problematic, we

do not read the Board's opinion in that fashion.

In considering this issue, the Board refused to

presume, absent scientific evidence, that a large quantity of

lightly treated sewage estimated as 850 tons per year would

have no impact on the surrounding stressed waters in the event

that other stresses abated. See Board Op. at 15-16. This

11PRASA does offhandedly suggest that its studies make the
requisite showing indirectly. Compliance with (f)(1), PRASA

muses, might in some cases provide a scientific basis for the
prediction required by (f)(3). While that may (or may not) be so
in theory, it is certainly not so on the facts of this case.
Here, PRASA's showing of no current impacts was weak at best, see

infra note 12, and cannot support the weight of the proposed

inference.

23

neither betokens an absolutist mindset nor forecloses the

possibility that the Board might entertain a presumption of no

future harm if presented with the prospect of more modest

emissions. Nor does the Board's opinion foreclose the

possibility that it might find a scientific showing of no future

impacts to be persuasive. On the contrary, after noting EPA's

"great reluctance" to sanction emissions into stressed waters,

the Board made a point of leaving the door ajar:

This is not to say that there is no case
where discharges into stressed waters would
be allowed. Where, for example, the
receiving waters are stressed by pollutants
other than those in the proposed discharge
and such pollutants do not contribute to
existing stresses, a 301(h) permit may be
appropriate.

Id. at 18 & n.22.

To say more would be to paint the lily. We conclude

that EPA did not promulgate an absolutist standard. And,

moreover, we find the Board's rendition of the evidence to be

faithful to the record, its reasoning to be sound, and its

position to be well-supported by authority. Consequently, we

hold that the Board acted within its authority in denying

petitioner an evidentiary hearing and summarily terminating the

administrative appeal on the ground that the studies submitted by

petitioner failed to make any attempt to satisfy the strictures

of 40 C.F.R. 125.61(f)(3).12

12The Board gave an alternative reason for upholding EPA's
refusal to convene an evidentiary hearing, ruling that petitioner
failed to show that its discharge did not currently "contribute
to, increase, or perpetuate . . . stressed conditions." 40

24

VI. CONCLUSION

We need go no further. PRASA's application for

modification and its concomitant request for an evidentiary

hearing were fairly considered and appropriately rejected. For

the reasons set forth herein, we uphold the agency's final action

and deny PRASA's petition for review.

It is so ordered.

C.F.R. 125.61(f)(1) (1993). We need not pursue this point, for
petitioner's failure to adduce hearing-worthy evidence on the
future impacts prong is in itself enough to justify denying the
instant petition for judicial review. We add in passing,
however, that the record strongly suggests the correctness of the
Board's conclusion on the current impacts prong as well.

25